# CAMERON SEPTIC TANK COMPANY *v.* CITY OF KNOXVILLE, IOWA.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF IOWA.

No. 82.   Argued December 11, 12, 1912.—Decided January 20, 1913.

Although under §4884, Rev. Stat., a patent is for seventeen years, under the provision of § 4887, Rev. Stat., as it has been judicially construed, the American patent granted for an invention previously patented in another country is limited by law, whether so expressed in the patent itself or not, to expire with the foreign patent previously granted having the shortest term.

Section 4887, Rev. Stat., limiting patents to the period of the same patent previously granted by a foreign country, if any, has not been superseded by Article 4 *bis* of the Treaty of Brussels of 1900.

A most essential attribute of a patent is the term of its duration, which is necessarily fixed by local law, and the Treaty of Brussels will not be construed as breaking down provisions of the local law regulating the issuing of the patent.

The act of 1903 effectuating the provisions of the Brussels Treaty, as construed in the light of surrounding circumstances and of similar legislation in other countries, did not extend an American patent beyond the period prescribed by § 4887, Rev. Stat.

The Brussels Treaty of 1900 should be construed in accordance with the declaration of the Congress at which it was framed and adopted at the instance of the American delegates; and it was the sense of the Congress of the United States that the treaty was not self-executing.

The act of 1903 did not make Article 4 bis of the Treaty of Brussels effective or override the provisions of § 4887, Rev. Stat.

THE facts, which involve the construction of §§ 4884 and 4887, Rev. Stat., as affected by the Treaty of Brussels of 1900 and the effect of prior patents in foreign countries on the duration of an American patent, are stated in the opinion.

Mr. Henry Love Clarke for appellant.

Mr. Wallace R. Lane, with whom Mr. R. L. Welch and Mr. Samuel H. Crosby were on the brief, for appellee.

MR. JUSTICE McKENNA delivered the opinion of the court.

A bill in equity was brought by appellant as successor to the rights of an invention patented under United States letters patent to Edwin Cameron et al. for a process and an apparatus for treating sewage, No. 634,423, dated October 3, 1899. The bill contained the usual allegations and prayed for an injunction to restrain appellee from the use of the invention. Appellee filed a plea to the bill in which it alleged that the invention had been previously patented in Great Britain by letters patent dated November 8, 1895, and that that patent had expired on or before the eighth day of November, 1909, being the expiration of

the term for which it was granted, and that therefore the United States patent expired and became terminated by law, and it being stipulated that the 'bill should be considered as filed as of that date, and as the bill was not filed with the purpose or intention of applying for or obtaining an injunction before the expiration of the British patent, no injunctive or equitable relief could be had. A dismissal of the bill was therefore prayed. The decree of the court recited the facts of the plea and adjudged that the patent had expired as therein alleged and that its expiration was not prevented "by any effect of the Treaty of Brussels of December 14, 1900, which Treaty and the construction thereof was drawn in question on the plea in this cause;" and that therefore the court was without jurisdiction, the complainant having a plain and adequate remedy at law. This appeal was then prosecuted under § 5 of the Circuit Court of Appeals Act, March 3, 1891, 26 Stat. 826, c. 517.

The single question here is whether the United States patent expired with the British patent according to the laws which existed when it was issued or whether its existence was preserved by the Treaty of Brussels.

At the time the patent was issued § 4884, Revised Statutes, made the term of a patent seventeen years, and by § 4887 it was provided that the receiving of a foreign patent did not prevent the granting of a United States patent. It was, however, provided that "every patent granted for an invention which has been previously patented in a foreign country shall be so limited as to expire at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest term, and in no case shall it be in force more than seventeen years."

The section coming up for judicial consideration, it was decided that it assumed that the foreign patent previously granted was one granted for a definite term, that the United States patent should expire with that

term, and that it was not to be limited by any lapsing or forfeiture of any portion of the term of the foreign patent, by means of the operation of a condition subsequent, according to the foreign statute. *Pohl* v. *Anchor Brewing Co.*, 134 U. S. 381, 386. And it was held that the American patent is limited by law, whether it is so expressed or not in the patent itself, to expire with the foreign patent having the shortest term. *Bate Refrigerating Co.* v. *Hammond*, 129 U. S. 151, 167; *Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S. 1, 43; *Leeds & Catlin Co.* v. *Victor Co.*, 213 U. S. 301, 325.

Appellee contends that these decisions and the cited sections of the Revised Statutes constituted the law of the United States patent to Cameron and caused it to terminate with the expiration of the term of the British patent. The argument is that it was granted not for seventeen years but for a term to be measured by that of the foreign patent, enduring the full term for which the latter was granted but no longer, though on its face it was to run seventeen years. The appellant, opposing the contention, insists that the Treaty of Brussels has superseded § 4887 and has freed the Cameron patent from subjection to the provisions of that section. It is the effect of the contention that, though the patent was issued for a definite term, as decided by the cited cases, the term was enlarged by the Treaty.

Appellant candidly admits that there are cases adverse to its contention, but seeks to limit their strength of persuasion or authority to one only, and to that one opposes the reasoning and precedent of another. The cases so put in opposition are *United Shoe Machinery Co.* v. *Duplessis Shoe Machinery Co.*, 155 Fed. Rep. 842, decided by the Circuit Court of Appeals of the Second Circuit against the effect of the treaty contended for, and *Hennebique Construction Co.* v. *Myers*, 172 Fed. Rep. 869, decided by the Circuit Court of Appeals of the Third Circuit,

which is asserted to be the other way. But the cases do not present the antagonistic authority of two courts. Judge Archbald, whose views in the latter case are relied on by appellant, stated in a subsequent one (*Union Typewriter Company* v. *L. C. Smith & Bros.*, 173 Fed. Rep. 288, 299) that his opinion was not that of the court.

The other cases in which the Brussels Treaty was considered, and in which it was decided that it did not enlarge the term of an American patent beyond the term of a foreign patent for the same invention, are the following: *Malignani et al* v. *Hill-Wright Electric Co.*, 177 Fed. Rep. 430; *Malignani et al.* v. *Jasper Marsh Consol. Elec. Lamp Co.*, 180 Fed. Rep. 442; *Commercial Acet. Co.* v. *Searchlight Gas Co.*, 197 Fed. Rep. 908. Appellant contends, as we have seen, that these cases do not express independent views but follow *United Shoe Machinery Co.* v. *Duplessis Shoe Co.* as authority. This is not true to the extent contended. In the first two cases an independent judgment was expressed. In the third case (197 Fed. Rep. 908) it was said of *United Shoe Machinery Co.* v. *Duplessis Shoe Company* that it was "well considered and very persuasive" and was "deemed to be the correct expression of the law for the purpose" of the hearing. Judicial opinion must therefore be ranged against appellant's contention and is persuasive, at least, of its unsoundness.

Appellant, however, relies on the words of the treaty, which, it is insisted, have no ambiguity whatever, and which, it is contended, by the proclamation of the President of September 14, 1902, became the "'supreme law of the land.'" The provision relied on reads as follows:

"Art. 4 *bis*. Patents applied for in the different contracting States by persons admitted to the benefit of the convention under the terms of articles 2 and 3 shall be independent of the patents obtained for the same invention in the other States adherents or non-adherents to the Union.

"This provision shall apply to patents existing at the time of its going into effect.

"The same rule applies, in the case of adhesion of new States, to patents already existing on both sides at the time of the adhesion." 32 Stat. 1940.

The Cameron patent existed at the time the treaty went into effect, and the British patent by which it was limited was a patent obtained in one of the States adhering to the treaty, namely, Great Britain. It is hence contended that all of the conditions necessary to the application of the treaty to the Cameron patent existed, and the limitation of its term to that of the British patent as provided by law at the time it was issued was removed, that law being repealed by the treaty, which, it is contended further, was self-executing, and the patent became a grant for seventeen years. Two propositions are involved in the contentions: (1) that the treaty applies to the Cameron patent; (2) that the treaty is self-executing. If either proposition be erroneous, appellant's contentions are untenable.

To say that the text of the treaty is without ambiguity does not carry us far. All of the conditions of a patent are not expressed in it, and when these are considered construction is demanded and must be exercised. What is meant by the independence of a patent for the same invention in different States? It certainly was not intended to break down all of the provisions of law applicable to a patent; in other words, to interfere with the manner of its grant, and, it would seem by necessary implication, the extent of its grant as provided by the local law. A most essential attribute of a patent is the term of its duration, which is necessarily fixed and determined by the local law. And what difference in principle or effect is there if the term be expressed directly by a number of years or by something else, as a foreign patent which has a certain duration? The patent is no

more contingent in one case than in the other. It is complete in both cases at the moment it is issued. In both cases its term has certain definition given by the local law. And this is the declaration of the cases, and that the integrity of its term and its independence were not affected by subsequent conditions which might terminate the foreign patent.

But it is contended that so to confine the treaty is to deprive it of significance and force because the decisions of this court had given to patents such independence. *Pohl* v. *Anchor Brewing Company*, 134 U. S. 381. The answer is not sufficient. It might have been thought worth while to give conventional sanction to the judicial construction and make it applicable to the adhering States whose laws were not uniform; and it is certain that there was an immediate demand of the American delegates so to qualify the provision that it should not extend the term of the monopoly of the patent beyond that which was given by the law under which the patent had been issued.

The details of the conference are set out in *Hennebique Construction Co.* v. *Myers, supra.* It appears that Mr. Forbes, one of the American delegates, pointed out that if Article 4 *bis* could be interpreted as applying to patents already issued, which he said it might be, it would encounter opposition in the United States, and he inquired whether it could not be made the subject of a special protocol. A view was expressed that the Article would not produce the apprehended effect, but Mr. Forbes insisted on the necessity of stating the point precisely in order to avoid error of interpretation. After debate, in which different views were expressed, the Director of the International Bureau suggested the following amendment: "This provision shall apply to patents in existence at the time of its being put into force. Its effects are, however, limited to nullities and lapses which

would affect anterior patents." The amendment was not adopted, but, following the suggestion of Mr. Bellamy ·Storer, one of the delegates from the United States, the President "put to vote the adoption of the text previously adopted for Article 4 *bis*, with the interpretation which the American delegation desired to specifically point out, by proposing to complete the second paragraph by supplementing this explanatory clause: 'However, the term fixed by the initial law of each country remains intact.' Article 4 *bis* is definitely adopted with this condition."

It is, however, urged that the delegate from Great Britain said that he "could only take the indicated act of interpretation as a declaration of the American delegation and not as a decision of the Conference." The proceedings, however, show that the Conference adopted the whole of the first final protocol prepared by the Committee on Reports.

Certain subjects were not disposed of by the Conference but postponed with the comment that "after the exchange of views through diplomatic channels," the Conference would "reassemble anew in the Belgian Capital in order to finish its work."

The American delegates reported to the Secretary of State their understanding of the meaning of Article 4 *bis* and the interpretation which had been given it by the Conference. The unanimous sanction of the Conference, they said, was that the second paragraph of Article 4 *bis*, which reads: "This provision shall apply to all patents existing at the time of its entering into force," was not applicable to existing United States patents but only to those patents whose terms might be shortened by the laws of those States of the Union [for the Protection of Industrial Property] in which provision was made for the shortening of the term on the lapsing of patents for the same invention in other States. Existing United States patents, they further reported, could not be affected by what might take place

in regard to a foreign patent, their terms having been determined by § 4887 at the moment they were issued and that therefore their duration was unaffected by the subsequent expiration of a foreign patent for the same invention by reason of non-payment of taxes or non-working.

There was a second session of the Conference in December, 1900. Article 4 *bis* was not further debated. There was some reference to it as one of three arrangements "concerning retroactivity." Appellant hence insists that having that quality the article necessarily applied to existing patents and was a "plain and simple retroactive ending of the former dependence of existing patents upon the running of the terms allowed to foreign patents." To confine the provision, it is contended further, to "mere future contingencies that might befall patents would be prospective and not 'retroactive.'" In aid of these contentions it is urged that the American delegates, two of whom were new, made no objection to the declaration of the retroactivity of Article 4 *bis*, and that no limiting protocol was annexed to the treaty when it was finally adopted at Brussels in 1900 and that the Article was ratified by the Senate and proclaimed by the President without qualifying it. The considerations have strength, but there are opposing ones. The second session of the Conference was a continuation of the first. The American delegates had secured an interpretation of Article 4 *bis*. It could be accepted by them as final and definite. There was no challenge of it by ascribing retroactivity to Article 4 *bis*, for that Article was recognized to have such effect but not to extend the term of a patent fixed by the initial law. Future contingencies, as said by appellant, would of course be prospective, but whether patents existing at the time of the treaty should be subject to them or independent of them was retroactive.

The action of Congress must be taken into account in estimating appellant's contentions. In *United Shoe*

*Machinery Co.* v. *Duplessis Shoe Machinery Co., supra,*
it was made determinative, and the court decided that
what construction should be put on Article 4 *bis,* and
what rule should apply as to its becoming effective be-
came academic questions in view of the provisions of the
act of Congress of 1903, entitled "An Act to Effectuate
the Provisions of the Additional Act of the International
Convention for the Protection of Industrial Property."
The act of 1903 was preceded by—and probably induced
by—a letter which the Chargé d'Affaires of Switzerland
addressed to the Secretary of State. The letter was
prompted, according to its representations, by the em-
barrassment to which the International Bureau was sub-
jected on account of the uncertainty of the action of the
United States in regard to the Additional Act of Brussels
of December 14, 1900, the treaty being so designated. It
referred to the Convention of March 20, 1883, and the
approval by the Senate of that Convention in 1887, but it
stated "that Congress had not brought into the Federal
law the changes required to make it consonant with the
Convention," and that, "according to the opinion ren-
dered by Attorney General Miller in 1889, American
courts have consistently decided that the Convention of
1883 could not be enforced in the United States except so
far as it accorded with the law of the country." The
opinion was expressed that the difficulties attending this
condition of things were not so great as they would have
been in some other country, but it was said, however, that
the circumstances had changed since the Additional Act of
Brussels went into effect. One of the most important of
its provisions, it was said, was that which amends Article 4
of the Convention of 1883, extending to one year the
priority of six months during which the original applicant
for a patent in one of the States of the Union may validly
file an application for the same invention in the other
contracting States. After some comment on the priority

period, the letter proceeded as follows: "The Bureau is placed in an awkward situation. On the one hand, it cannot say that the United States will not enforce the Additional Act it has ratified and has asked should go into effect. On the other hand, it is without information that the bills relative to industrial property that have been framed in the committee organized under the act of June 4, 1898, have been passed by Congress; and it is constrained to admit that according to judicial precedents the new Treaty provisions could not be enforced until the corresponding legislation shall have been revised." The required legislation was urged.

The Secretary of State replied to the letter, describing it as "in regard to the provisions of the Industrial Property Convention of March 20, 1883, and the Brussels Act of December 14, 1900, modifying it," and said that he was advised by the Secretary of the Interior that he had prepared a bill "to make effective in this country the Convention and modifying Act in question."

The act of 1903 was then enacted, and if there could be any doubt that it expressed the sense of Congress and those concerned with the treaty that it required legislation to become effective, such doubt would be entirely removed by the legislative action of other States. It appears from the report of the Committee on Patents of the Senate and of the House of Representatives on the proposed legislation that thirteen countries had adopted legislation giving full force and effect to the provisions of the Additional Act either in the form of a general law or by specific amendment to other laws providing for carrying into force the provisions of the Additional Act as regards the extension of the "delay and priority" to twelve months. Other countries were mentioned as being expected to do so. In explaining the object of the bill the member in charge of it in the House of Representatives said that it was to carry into effect the Additional Act of the Convention held at

Brussels in December, 1900; and, further, that the Additional Act agreed upon simply extended the period of priority in applications for patents, and that it did not "extend by a single instant the life of any patent now in existence, or any patent that may be granted hereafter." He further said that nearly all of the nations which were represented at Brussels had already passed legislation to give force to the act and that it was but fair that this country should take similar action.

An attempt is made by appellant to distinguish between Article 4 *bis* and the provisions of the treaty expressly dealt with by Congress, and to assign to that Article a more distinct and definite power of execution than the other provisions possess. To account thereby for its omission from the act of 1903, it is urged, that those provisions concern matters of administrative law which might be or thought to be in conflict with statutory provisions, whereas Article 4 *bis* accomplished all that it could accomplish the instant the treaty went into effect and there was nothing further to be done as a matter of administrative law. We are unable to accept the distinction, and appellant is therefore brought to this alternative. If the treaty be construed, as we think it must be construed, in accordance with the declaration of the Conference at the instance of the American delegates, it has no application to the Cameron patent. If it be not self-executing, as it is certainly the sense of Congress that it was not and seems also to be the sense of some of the other contracting nations, and as the act of 1903 did not make effective Article 4 *bis*, the provisions of § 4887 apply to the Cameron patent, and caused it to expire with the British patent for the same invention.

*Decree affirmed.*