**GENERAL · ELECTRIC CO. et al. v. ROBERTSON, Commissioner of Patents.**

District Court, D. Maryland.　July 13, 1927.

No. 1027.

**1. Treaties ⚫11—The matter of patents is within treaty-making power, and treaty controls ·over prior inconsistent statute (Const. art. 1, § 8, cl. 8; art. 2, § 2, cl. 2; art. 6, cl. 2).**

The matter of patents is within the treaty-making power, and the fact that the Constitution expressly vests Congress with power to enact patent legislation (article 1, § 8, cl. 8) does not change the general rule that, as between a treaty and an act of Congress, standing on a priority as the law of the land (Const. art. 2, § 2, cl. 2; article 6, cl. 2), if there is a conflict, the later governs.

**2. Treaties ⚫12—Provisions of Treaty of Berlin relating to patent rights held self-executing, and to extend the time within which German citizen holding German patent issued during the war may apply for United States patent for six months after treaty became effective (Treaty of Berlin; Rev. St. § 4887 [Comp. St. § 9431]; Nolan Act March 3, 1921 [Comp. St. §§ 9431a–9431h]).**

The Treaty of Berlin (42 Stat. 1939), as to that part dealing with patent rights, *held* self-executing, and to have the effect of extending the right given by Rev. St. § 4887 (Comp. St. § 9431), as extended by Nolan Act March 3, 1921 (Comp. St. §§ 9431a–9431h), to secure a United States patent for an invention previously patented in a foreign country on an application made within 12 months, by giving the German holder of a German patent issued during the war 6 months after November 11, 1921, when the treaty became effective, within which to make his application.

**3. Treaties ⚫12—Words of futurity in treaty do not necessarily indicate executory rather than self-executing contract.**

The mere use of words of futurity in a treaty granting reciprocal rights does not necessarily indicate an executory, as distinguished from a self-executing, contract.

In Equity.　Suit by the General Electric Company and Ernest Stoffregen against Thomas E. Robertson, Commissioner of Patents.　On motion to dismiss bill.　Motion denied.

Fish, Richardson & Neave, of New York City, and Semmes, Bowen & Semmes, of Baltimore, Md., for complainants.

Herman J. Galloway, Henry C. Workman and T. ·A. Hostetler, all of Washington, D. C., and Amos W. W. Woodcock, of Baltimore, Md., for defendant.

SOPER, District Judge.　Ernest Stoffregen, a citizen of Germany, who is the inventor of certain improvements in the methods and apparatus applicable to electric arc welding, and the General Electric Company, a New York corporation, who is the assignee of his title and interest in the invention, have filed a bill of complaint, under R. S. § 4915 (Comp. St. § 9460), claiming that letters patent of the United States for the invention should be issued to the corporation.　Stoffregen filed an application in Germany for a German patent on October 11, 1915, and a patent issued thereon October 20, 1919.　He also filed an application in due form with the defendant, as Commissioner of Patents of the United States, for letters patent of the United States on said improvements on May 10, 1922.　This application was barred by R. S. § 4887 (Comp. St. § 9431), since it was not filed within 12 months after the application for the foreign patent was filed.

Nor was the application in the United States Patent Office saved by the Nolan Act of March 3, 1921 (41 Stat. 1313 [Comp. St. §§ 9431a–9431h]), providing in effect that the rights of priority provided by section 4887, which had arisen since August 1, 1914, should be extended until the expiration of 6 months from March 3, 1921, in favor of citizens of the United States and of the citizens of all countries which should extend substantial reciprocal privileges to citizens of the United States.

The complainants, however, contend that under the Treaty of Berlin (42 Stat. 1939), whereby peace between the United States and Germany was declared, the time for filing a German patent in this country was extended for 6 months from November 11, 1921, when the treaty took effect.　If such be the case, the application was filed one day before the period expired.　The tribunals of the Patent Office and the Court of Appeals of the District of Columbia (In re Stoffregen, 56 App. D. C. 23, 6 F.[2d] 943) decided this contention adversely to the complainant.

The United States moves to dismiss the bill of complaint, contending that the Treaty of Berlin. did not operate to change the acts of Congress relating to patents, for the following reasons: (1) It is beyond the scope of the treaty-making power to enter into a convention modifying the patent laws of the United States.　Such a convention, if made,

does not become effective without the aid of an act of Congress. (2) It was not the intention of the parties to the Treaty of Berlin that the provisions pertaining to patents should become effective until ratified by an act of Congress.

[1] Article 1, § 8, cl. 8, of the Constitution provides that the Congress shall have power to promote the progress of science and useful arts by securing for limited times to inventors the exclusive rights to their respective discoveries. By the last clause of the same section, Congress is given power to make all laws which shall be necessary and proper for carrying into execution the aforegoing power. It is said, therefore, that since R. S. § 4887, was within the scope of the powers of Congress, it was beyond the scope of the treaty-making power to modify it. On the other hand, article 2, § 2, cl. 2, of the Constitution gives the power to the President, by and with the advice and consent of the Senate, to make treaties, and article 6, cl. 2, provides that the Constitution and the laws of the United States, which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land.

That acts of Congress and treaties stand on an equal footing as the supreme law of the land is settled beyond dispute by decisions of the Supreme Court. It was early said by Chief Justice Marshall in Foster v. Neilson, 2 Pet. 314, 7 L. Ed. 415:

"A treaty is, in its nature, a contract between two nations, not a legislative act. It does not generally effect, of itself, the object to be accomplished; especially, so far as its operation is infraterritorial; but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States, a different principle is established. Our Constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the Legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the Legislature must execute the contract, before it can become a rule for the court."

Again it was said in Whitney v. Robertson, 124 U. S. 190, 8 S. Ct. 456, 31 L. Ed. 386:

"Both [treaties and acts of Congress] are declared by that instrument [the Constitution] to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always the stipulation of the treaty on the subject is self-executing."

This principle has been applied, not only in those cases in which a subsequent act of Congress has been held to repeal the treaty, but also where the contrary was the case. The Cherokee Tobacco, 11 Wall. 616, 621, 20 L. Ed. 227; United States v. Lee Yen Tai, 185 U. S. 213, 22 S. Ct. 629, 46 L. Ed. 878; Ribas y Hijo v. United States, 194 U. S. 315, 324, 24 S. Ct. 727, 48 L. Ed. 994.

It is necessary only to determine whether the matter covered by the treaty is within the scope of the treaty-making power, which has been clearly defined in Geofroy v. Riggs, 133 U. S. 258, 266, 10 S. Ct. 295, 296 (33 L. Ed. 642), as follows:

"That the treaty power of the United States extends to all proper subjects of negotiation between our government and the governments of other nations is clear. * * * The treaty power, as expressed in the Constitution, is in terms unlimited, except by those restraints which are found in that instrument against the action of the government, or of its departments, and those arising from the nature of the government itself, and of that of the states. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government, or in that of one of the states, or a cession of any portion of the territory of the latter, without its consent. * * * But, with these exceptions, it is not perceived that there is any limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country."

There can be no question that the matter of patents, which plays so important a part in the affairs of international commerce, is within the scope of the treaty-making power. United Shoe Machinery Co. v. Duplessis Shoe Machinery Co., 155 F. 842 (First Circuit); Hennebique Construction Co. v. Myers, 172 F. 869 (Third Circuit). In the first of these cases it was truly said that it is of no consequence that the Constitution commits to Congress the power to promote the progress of science and useful arts in this connection, because all the powers of Congress are especially vested in a

similar manner, and to hold that a treaty cannot abrogate a prior statute regarding patents, because this particular legislative power is committed to Congress, would set aside the general rule so well established that, as between a treaty and an act of Congress, that which is the later prevails.

[2] It becomes necessary, therefore, to examine more carefully the terms of the treaty, so as to ascertain whether upon the face of the document there is apparent an intent to defer its execution until the Congress of the United States should act. See Redmond, Treaties, etc., between the United States and Other Powers, vol. 3, p. 2596; 42 Stat. 1939. Article 1 provides that Germany undertakes to accord to the United States, and the United States shall have and enjoy, all the rights and privileges stipulated for the benefit of the United States in the Treaty of Versailles, which the United States shall fully enjoy, notwithstanding the fact that such treaty has not been ratified by the United States. Article 2, subsec. 1, in part is as follows:

"The rights and advantages stipulated in that [Versailles] Treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in * * * part X. * * * The United States, in availing itself of the rights and advantages stipulated in the provisions of that treaty, * * * will do so in a manner consistent with the rights accorded to Germany under such provisions."

Article 2, subsec. 5, provides that the period of time, to which reference is made in article 440 of the Treaty of Versailles, shall run, with respect to any act or election on the part of the United States, from the date of the coming into force of the present treaty; that is to say, November 11, 1921, when the Treaty of Berlin took effect.

By reference to part X of the Treaty of Versailles, it appears that articles 306, 307, and 308 of section VII, entitled "Industrial Property," deal with patent rights.

Article 306 provides that the International Convention of Paris of March 20, 1883 (25 Stat. 1372), regarding patents, shall be re-established or restored as from the coming into force of the present treaty, and that rights which, except for the war, would have been acquired during the war in consequence of an application made for the protection of industrial property, shall be recognized and established in favor of those persons who would have been entitled thereto, from the coming into force of the treaty.

Article 307 provides that a minimum of one year after the coming into force of the present treaty shall be accorded to the nationals of the high contracting parties, without extension fees or other penalty, in order to enable such persons to accomplish any act, fulfill any formality, pay any fees, and generally satisfy any obligation prescribed by the laws or regulations of the respective states relating to the obtaining, preserving, or opposing rights to, or in respect of, industrial property, either acquired before August 1, 1914, or which, except for the war, might have been acquired since that date as a result of an application made before the war or during its continuance, but nothing in this article shall give any right to reopen interference proceedings in the United States of America where a final hearing has taken place.

Article 308, the provision of chief importance in the present situation, provides in part:

"The rights of priority, provided by article 4 of the International Convention for the Protection of Industrial Property of Paris, of March 20, 1883, revised at Washington in 1911, or by any other convention or statute, for the filing or registration of applications for patents or models of utility, and for the registration of trade-marks, designs and models which had not expired on August 1, 1914, and those which have arisen during the war, or would have arisen but for the war, shall be extended by each of the high contracting parties in favor of all nationals of the other high contracting parties for a period of six months after the coming into force of the present treaty."

The rights of priority provided by article 4 of the International Convention of Paris, are also defined by R. S. § 4887. It declares that no person otherwise entitled thereto shall be debarred from receiving a patent for an invention by reason of its having been first patented in a foreign country, unless the application for the foreign patent was filed more than 12 months prior to the filing of the application in this country. The rights of priority which arose during the war, or which would have arisen, but for the war, as is the case with the Stoffregen invention in issue, were thus extended by the Treaty of Berlin, if it be self-executing, in favor of all nationals of Germany and the United States for a period of 6 months after November 11, 1921.

The authorities do not uniformly hold that a treaty which purports to modify the patent laws of the United States needs an act of Congress to effectuate it. A study of those which support the theory demonstrates

quite clearly that it originated in an opinion of Attorney General Miller of April 5, 1889, 19 Op. Atty. Gen. 273. Indeed, it is fair to say that in all of the cases brought to the attention of the court, which follow the opinion, it has been apparently accepted without an independent examination of the authorities. It followed the ratification in 1887 by the United States Senate of the International Convention of 1883 (25 Stat. 1372). The Attorney General was asked to decide whether a Swiss citizen was entitled to the benefits of R. S. § 4902, relating to the right to file caveats, preliminary to applications for patents, to the same extent as a citizen of the United States, by reason of the provisions of the second article of the Convention of 1883. That article provides:

"The subjects or citizens of each of the contracting states shall enjoy, in all the other states of the Union, so far as concerns patents for inventions, trade or commercial marks, and the commercial name, the advantages that the respective laws thereof at present accord, or shall afterwards accord to subjects or citizens. In consequence they shall have the same protection as these latter, and the same legal recourse against all infringements of their rights, under reserve of complying with the formalities and conditions imposed upon subjects or citizens by the domestic legislation of each state."

The Attorney General declared that it was not necessary to the decision of the question to determine whether all the provisions of treaties, whose execution requires the exercise of powers submitted to Congress, must be so submitted before they become law to the courts and executive departments. He said: "The treaty under consideration is a reciprocal one; each party to it covenants to grant in the future to the subjects and citizens of the other parties certain special rights in consideration of the granting of like special rights to its subjects or citizens. It is a contract operative in the future infraterritorially. It is therefore not self-executing, but requires legislation to render it effective for the modification of existing laws." The opinion is based upon the rule, set out in the above quotation from Foster v. Neilson, supra, that when either of the contracting nations engages to perform a particular act, the treaty addresses itself to the political, not the judicial, department, and the Legislature must execute the contract before it can become a rule for the court.

Chief Justice Marshall had under consideration in that case the terms of the treaty between the United States and Spain of February 22, 1819 (8 Stat. 252), for the cession of certain territory, which provided that all "grants of land made before the 24th of January, 1818," by Spain in the territory ceded, "shall be ratified and confirmed to the persons in possession of the lands." The question was whether these words acted directly on the grants, so as to give validity to those not otherwise valid, or whether they pledged the faith of the United States to pass acts to ratify and confirm them. The court said: "The article under consideration does not declare that all the grants made * * * shall be valid. * * * It does not say that those grants are hereby confirmed. Had such been its language, it would have acted directly on the subject, and would have repealed those acts of Congress which were repugnant to it; but its language is that those grants shall be ratified and confirmed to the persons in possession," etc. "This seems to be the language of contract; and, if it is, the ratification and confirmation which are promised must be the act of the Legislature. Until such act shall be passed, the court is not at liberty to disregard the existing laws on the subject."

However, when the same treaty was before the Supreme Court in United States v. Percheman, 7 Pet. 51, 8 L. Ed. 604, it was discovered that in the Spanish version the clause provided that the grants "shall remain ratified and confirmed to the person in possession of them." The court said: "Although the words 'shall be ratified and confirmed,'" in the English version, "are properly the words of contract, stipulating for some future legislative act, they are not necessarily so. They may import that they 'shall be ratified and confirmed,' by force of the instrument itself. When we observe that in the counterpart of the same treaty, executed at the same time by the said parties, they are used in this sense, we think the construction proper, if not unavoidable." The court therefore held that the treaty was self-executing.

[3] It therefore becomes quite clear that the mere use of words of futurity in a treaty granting reciprocal rights does not necessarily indicate an executory as distinguished from a self-executing contract. The following cases are to the same effect: U. S. v. Wiggins, 14 Pet. 334, 10 L. Ed. 481; Rutherford v. Greene's Heirs, 2 Wheat. 196, 4 L. Ed. 218; Chirac v. Chirac, 2 Wheat. 259, 270, 4 L. Ed. 234; U. S. v. The Peggy, 1 Cranch, 103, 107, 2 L. Ed. 49; Whitman v. National Bank of Oxford, 176 U. S. 559, 20 S. Ct. 477, 44 L. Ed. 587; Jones v. Mee-

han, 175 U. S. 1, 10, 20 S. Ct. 1, 44 L. Ed. 49; Chew Heong v. U. S., 112 U. S. 536, 5 S. Ct. 255, 28 L. Ed. 770. The recent decision in Asakura v. Seattle, 265 U. S. 332, 44 S. Ct. 515, 68 L. Ed. 1041, considered the treaty between the United States and Japan of April 5, 1911 (37 Stat. 1504). It contains the following provision:

"The citizens or subjects of each of the high contracting parties shall have liberty to enter, travel and reside in the territories of the other to carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops, to employ agents of their choice, to lease land for residential and commercial purposes, and generally to do anything incident to or necessary for trade upon the same terms as native citizens or subjects, submitting themselves to the laws and regulations there established. * * * The citizens or subjects of each * * * shall receive, in the territories of the other, the most constant protection and security for their persons and property." Article 1.

Holding that the treaty rendered void an ordinance of a city in the state of Washington confining a certain business to citizens of the United States, the court said: "The rule of equality established by it cannot be rendered nugatory in any part of the United States by municipal ordinances or state laws. It stands on the same footing of supremacy as do the provisions of the Constitution and laws of the United States. It operates of itself without the aid of any legislation, state or national, and it will be applied and given authoritative effect by the courts."

In view of these authorities, it is difficult to conclude that the language of the International Convention of 1883, declaring that subjects of each of the contracting states shall enjoy in all the other states the advantages that the respective laws thereof afford to subjects or citizens, should import a promise to be effectuated by subsequent legislation rather than a grant of privileges immediately operative. Nevertheless the opinion of the Attorney General is the basis of the decision of the Court of Appeals of the District of Columbia in Rousseau v. Brown, 21 App. D. C. 73, upon which in turn the Court of Appeals in the pending case chiefly relies. It is likewise the authority for the decisions in Butterworth v. Boral, 97 O. G. 1596; Electrical Accumulator Co. v. Julien Electric Co., C. D. 1893 p. 437, 59 F. 605; Ex parte Zwack & Co., 76 O. G. 1855.

On the other hand, the opinion of the Attorney General has not always met with the approval of the courts. It has been rejected by decisions of the Circuit Court of Appeals in the First and Third Circuits, in United Shoe Machinery Co. v. Duplessis Shoe Machinery Co., 155 F. 842, and in Hennebique Construction Co. v. Myers, 172 F. 869. These cases, as did Rousseau v. Brown, supra, had to do with the construction of the Treaty of Brussels of December 14, 1900 (32 Stat. 1936), by which the Convention of 1883 was modified. The question involved was whether a United States patent, based upon a foreign patent, expired simultaneously therewith, in accordance with the provisions of R. S. § 4887, as it existed before it was amended by the Act of March 3, 1897 (29 Stat. 693, § 3), or whether the United States patent lasted for the statutory period of 17 years by reason of article 4 bis of the Brussels Treaty, which provided that a patent applied for in one of the contracting states should be independent of a patent obtained for the same invention in another state.

The contention was made that the Convention of 1900 was not effectual until enacted into a statute by Congress, but Judge Putnam, speaking for the Circuit Court of Appeals of the First Circuit in United Shoe Machinery Co. v. Duplessis Shoe Machinery Co., said: "An examination of the decisions of the Supreme Court on this topic will show there is no practical distinction whatever as between a statute and a treaty with regard to its becoming presently effective, without awaiting further legislation. A statute may be so framed as to make it apparent that it does not become practically effective until something further is done, either by Congress itself or by some officer or commission intrusted with certain powers with reference thereto. The same may be said with regard to a treaty. Both statutes and treaties become presently effective when their purposes are expressed as presently effective; and, on its face, article 4 bis of the Convention in question is so expressed."

A similar decision was made by Judge Archbald in Hennebique Construction Co. v. Myers, supra, expressly overruling the opinion of the Attorney General. Judge Archbald's opinion was concurred in by Judge Gray, who based his decision on another ground, but said (pages 873, 874) that he agreed with the views expressed in the concurring opinion of Judge Archbald.

The weight of authority in the intermediate courts of appeal, therefore, favors the proposition that international conventions, relating to patents, may be self-executing,

even though they operate in effect to repeal prior acts of Congress. However, subsequent to the cases discussed, the Supreme Court decided Cameron Septic Tank v. Knoxville, 227 U. S. 39, 33 S. Ct. 209, 57 L. Ed. 407, which is also cited by the Commissioner of Patents and is relied on by the Court of Appeals in the case at bar. It reviews in part the events leading up to the execution of the Treaty of Brussels, and it may be useful in determining the bearing of the case upon the present controversy to supplement the story in some particulars. The opinion of the Attorney General of 1889 was followed by the Patent Office of the United States as a matter of course. On March 3, 1897, there was passed an act of Congress (29 Stat. 692), effective January 1, 1898, which revised and amended the patent laws. R. S. § 4887, was amended, so as to provide that no person should be debarred from receiving a patent for an invention by reason of its having been first obtained in a foreign country, unless the application for the foreign patent was filed more than 7 months prior to the filing of the application in this country. Formerly the section had declared that every such patent should be limited so as to expire at the same time with the foreign patent upon which it is based.

In December, 1897, the first session of the Second International Convention was held at Brussels to consider certain proposals of the International Bureau created by the Convention of 1883 and amongst others, the provisions of article 4 bis hereinbefore discussed. The convention adjourned for another session, and did not convene again until 1900. On June 4, 1898, an act of Congress was passed (30 Stat. 431), whereby three commissioners were appointed to revise the statutes relating to patents and trade-marks. The commissioners were directed to revise the laws in force so far as the same should relate to matters contained in or affected by the International Convention of Paris of 1883 and the Convention at Brussels of 1897. Their report was made on November 27, 1900 (see Senate Documents, vol. 3, No. 20, Second Session, 56th Congress, 1900–01). It referred to the opinion of Attorney General Miller and said: "While this opinion has no other effect than the creation of a rule of departmental practice, and is not binding upon the courts, it is our opinion that such legislation should be adopted as shall definitely and positively provide for carrying into effect the requirements of the Convention."

A further amendment of R. S. § 4887, was recommended to bring the 7 months' period provided by the section into harmony with the Convention of Brussels. The adjourned session of the International Convention was held at Brussels on December 11, 1900. It finished the work previously begun. Article 4 of the convention provided that the period of priority of 6 months fixed by the Convention of 1883 should be increased to 12.

The chargé d'affaires of Switzerland, on behalf of the International Bureau, wrote to the Secretary of State on October 29, 1902, complaining that numerous inquiries had been received concerning the position of the United States in regard to the Convention of 1883, and the additional act of Brussels in 1900. He said that, although the United States had ratified the first convention in 1887, Congress had never brought into the federal law the changes required to make it consonant with the convention. He cited the opinion of Attorney General Miller of 1889, that the Convention of 1883 could not be enforced in the United States, except so far as it accorded with the law of the country. He called particular attention to the amendment of article 4, extending to one year the priority period of 6 months, and noted that this provision was in direct conflict with R. S. § 4887. The bureau, he said, was placed in an awkward situation, not being able to say that the United States would not enforce the additional act, but, on the other hand, it was without information that the bill recommended by the commissioners had been passed by Congress. On December 29, 1902, the Secretary of State replied that on December 19, the Commissioner of Patents had prepared a bill to make the treaty effective, and that a copy of the bill had been sent to the Senate and House committees on patents.

On January 31, 1903, these committees submitted a report to their respective houses, stating that the purpose of the bill was to carry into effect the provisions of the additional Act of Brussels. Attention was called to the 7 months period provided by R. S. § 4887, and the extension of this period to 12 months by the treaty. It was said to be necessary that action be taken by Congress to amend R. S. § 4887. The report also showed the list of countries which had adopted legislation giving full force and effect to the provisions of the treaty, either by general or specific act. Subsequently Congress passed the Act of March 3, 1903 (32 Stat. 1225), entitled "An act to effectuate the provisions of the additional act of the International Convention for the Protection of Industrial Property." The proposed amendment of section 4887 was thereby enacted.

The decision in Cameron Septic Tank v.

Knoxville, supra, was rendered January 20, 1913. It involved substantially the same question in regard to the Treaty of Brussels as was considered in United Shoe Co. v. Duplessis Shoe Machinery Co. and Hennibique Construction Co. v. Myers, supra. Two propositions were involved: (1) Whether the treaty applied to the patent in suit, which had issued before the treaty was adopted; and (2) whether the treaty was self-executing. If the patentee failed to sustain either proposition, it was necessary to declare the patent in suit invalid. The court first discussed the history of the Convention of Brussels, and reached the conclusion that the treaty was not intended by the parties to have a retroactive effect, and therefore did not apply to United States patents issued before its adoption. Then, referring to the Act of Congress of March 3, 1903, the court said: "The act of 1903 was then enacted, and if there could be any doubt that it expressed the sense of Congress, and those concerned with the treaty, that it required legislation to become effective, such doubt would be entirely removed by the legislative action of other states," which had adopted general or specific legislation carrying into effect the provisions of the Treaty of Brussels.

Finally the court said: "Appellant is therefore brought to this alternative. If the treaty be construed, as we think it must be construed, * * * it has no application to the Cameron patent. If it be not self-executing, as it is certainly the sense of Congress that it was not, and seems also to be the sense of some of the other contracting nations, and as the act of 1903 did not make effective article 4 bis, the provisions of section 4887 apply to the Cameron patent, and caused it to expire with the British patent for the same invention."

It is contended that this is an express decision that the Treaty of Brussels was not self-executing, and that therefore the provision as to patents in the Treaty of Berlin must be given like effect. But the Supreme Court was careful not to say that the Treaty of Brussels was not self-executing. On the contrary, it explained that it was immaterial whether the treaty was self-executing or not. It decided that, if the treaty were self-executing, it was of no avail, because it did not apply to the patent in suit, and, if it were not self-executing, the patent must likewise fail, because it was not saved by the act of 1903. The court, however, did clearly state that both Congress and some of the contracting states were of the opinion that legislation was necessary to effectuate the terms of the treaty. There was no discussion of the forms of government of foreign countries who were parties to the treaty, so as to show whether in any of them legislation is necessary in any event to give effect to a treaty, or whether, as in the United States, a treaty may be carried into effect of its own weight as the supreme law of the land. The United States, however, strongly urges that the course of dealing with the Treaty of Brussels, and with other treaties which may be mentioned, indicates a general opinion in this country that a treaty affecting patents is not intended to go into effect until ratified by Congress. The Treaty of Berlin, it is said, must be assumed to have been passed with this rule in mind.

The practice of the United States government in this respect does not seem to have been entirely uniform. The next international convention on the subject of patents was held at Washington, and resulted in the Treaty of June 2, 1911, Treaties, vol. 3, p. 2953 (38 Stat. 1645, 1658). On May 10, 1912, President Taft transmitted a message to Congress (see House Documents 749, 62d Congress, 2d Session). It discusses certain features of the patent laws, and recommends the appointment of a commission to report a general revision, and the enactment of a statute to that effect. In passing, the message states: "Certain amendments to the patent laws are required to make effective the provisions of the Convention of the International Union for the Protection of Industrial Property, and signed June 2, 1911." The particular legislation necessary to accomplish this purpose is not described, and no legislation seems to have been enacted.

Certain conventions in regard to copyrights, trade-marks, and patents were entered into by the International Congress of American States at Buenos Aires on August 11 and August 20, 1910 (see 38 Stat. 1811; 39 Stat. 1675). An Act of Congress of March 19, 1920 (41 Stat. 533 [Comp. St. §§ 9516a–9516h]), was passed to provide the instrumentality for carrying out certain provisions of the Convention for the Protection of Trade-Marks. The Convention made provision for the registration in all of the contracting states of a trade-mark registered in any one of them, and required from the applicant the payment of an additional fee to cover the expense of international registration. Congress accordingly directed the Commissioner of Patents to keep a register of all such marks. The passage of the act doubtless involved a recognition of the treaty on the part

of Congress. It may have been necessary to secure legislation to provide a Bureau of Registration in this country. It does not follow that none of the provisions of the treaty were self-executing without legislation. Moreover, it seems that no legislation was requested or enacted to carry out the Convention in regard to copyrights or the Convention in regard to patents.

It is particularly pertinent that no attempt was made to secure an act of Congress to carry out the provisions of the Treaty of Berlin. It must be assumed, of course, that the contract was entered into in good faith. The failure to introduce in Congress a bill to effectuate the treaty provisions may be taken to indicate that no legislation was thought to be necessary. The short period of 6 months following the date upon which the treaty took effect, which was allowed for the filing of foreign patents, obviously necessitated prompt effort to secure an act of Congress, if the treaty provision was to have practical effect. Indeed, the brevity of the period serves to indicate that the contracting parties did not suppose that congressional action was necessary. It is not possible to assume, from the varying attitude which the government from time to time has assumed in the transactions which have been brought to the attention of the court, that the treaty-making power has definitely abandoned, so far as patents are concerned, the constitutional authority to enter into a self-executing treaty.

The Court of Appeals also relied upon a decision of the German Patent Office reported in Blatt fur Patent-Muster-Und Zeichenwesen for March 31, 1923, p. 33, to the effect that the Treaty of Berlin did not ipso facto grant an extension of the five-year period provided by the patent law of Germany for the institution of a suit to annul a patent. The decision was based upon two grounds: First, it was said that, before the treaty provisions as to patents would become effective, the United States must make an explicit statement indicating its desire to put them into effect. This conclusion is based upon the provisions of subsection 1 of article 2 of the treaty, that the United States, in availing itself of the rights stipulated in the treaty, will do so in a manner consistent with the rights accorded to Germany. The German version of the treaty is cited to support the interpretation. It is sufficient to say that the American version does not have this significance, and that the point is not relied upon by the United States. The second, and apparently the controlling, reason which actuated the Ger-

man Patent Office, was the prior announcement of the United States Patent Office that it would not regard the treaty provisions as applicable for the registration of German patents. This argument is, of course, not controlling in the courts of this country. The Supreme Court has decided in at least one particular that the Treaty of Berlin was self-executing. United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131. It is not thought that less weight should be given to the provisions relating to patents.

The motion to dismiss the bill of complaint will be overruled.