**GENERAL ELECTRIC CO. et al. v. ROB-
ERTSON, Commissioner of Patents.**

District Court, D. Maryland.    March 23, 1928.

No. 1027.

1. Patents ⬡══97—Treaty of Berlin held neces-
sary to further extension to German patentees
of priority rights for registration of patents,
in view of absence of legislation reciprocal to
Nolan Act (Nolan Act March 3, 1921 [35
USCA §§ 80–87; Comp. St. §§ 9431a–9431h];
35 USCA § 32 [Comp. St. § 9431]; Berlin
Treaty [42 Stat. 1939]).

In view of the fact that Germany did not
pass legislation reciprocal to the Nolan Act of
March 3, 1921 (41 Stat. 1313 [35 USCA §§ 80–
87; Comp. St. §§ 9431a–9431h]), which extended
the rights of priority for registration of pat-
ents given by Rev. St. § 4887 (35 USCA § 32;
Comp. St. § 9431), which legislation was neces-
sary in order that Nolan Act become available
to German citizens, until seven weeks before
expiration of time limit in Nolan Act, thus show-
ing reason to accord German patentees an ad-
ditional period not given to those of other na-
tions, *held*, that it cannot be said that provisions
of Treaty of Berlin (42 Stat. 1939), in so far
as it granted a further extension of priority of
rights for registration of patents to German
patentees by incorporation of article 308 of the
Treaty of Versailles. was unnecessary.

2. Treaties ⬡══7—Foreign text of treaty to
which United States is party may be con-
sulted to ascertain its meaning.

The foreign text of a treaty to which the
United States is a party may be consulted to as-
certain its meaning.

3. Treaties ⬡══8—Conclusion that patent rights
granted to United States in Treaty of Berlin
were merely optional held unwarranted.

A consideration of circumstances under
which the Treaty of Berlin (42 Stat. 1939) was
executed, the negotiations between the two na-
tions which preceded its execution, the debates
in the Senate when its confirmation was under
consideration, and the language of the treaty it-
self *held*, not to warrant conclusion that rights
conferred therein on the United States, particu-
larly those relating to rights of priority for reg-
istration of patents, were not given in præsenti,
but were merely optional, requiring further ac-
tion on part of United States to give them ef-
fect.

4. Patents ⬡══97—Treaty of Berlin held to ex-
tend time limit for registration of foreign pat-
ents, thus giving German patentee right to
register within six months after effective date
of treaty.

Treaty of Berlin (42 Stat. 1939) *held*, to
have extended time limit provided by article 308
of Versailles Treaty, which extended the rights
of priority for registration of patents for period
of six months after effective date of such treaty,
though such limit had expired prior to execution
of Treaty of Berlin, and hence German patentee
may register a German patent issued during the
war within six months after November 11, 1921,
when the Treaty of Berlin became effective.

In Equity. Suit by the General Electric
Company and another against Thomas E.
Robertson, Commissioner of Patents. Decree
for plaintiffs.

Fish, Richardson & Neave, of New York
City, and Semmes, Bowen & Semmes, of
Baltimore, Md., for complainants.

Herman J. Galloway, Henry C. Workman,
and T. A. Hostetler, all of Washington, D. C.,
and Amos W. W. Woodcock, of Baltimore,
Md., for defendant.

SOPER, District Judge. This case raises
the question whether the rights of priority
for the registration of foreign patents in this
country were extended by the treaty of peace
between the United States and Germany,
signed at Berlin August 25, 1921 (42 Stat.
1939), whereby it was agreed that certain
rights of priority stipulated for the benefit
of the United States in the Treaty of Ver-
sailles should be enjoyed by us, notwithstand-
ing our failure to ratify that treaty. The
case comes before the court on bill and an-
swer. A prior decision herein ([D. C.] 21
F.[2d] 214), to which inference may be
made for a more detailed recital of the facts,
overruled the motion of the Commissioner of
Patents to dismiss the bill as insufficient in
law. He then contended (1) that it was be-
yond the scope of the treaty-making power to
enter into a treaty modifying the patent laws
of the United States, unless it was made
subject to subsequent ratification by Con-
gress; and (2) that it was not the intention
of the parties to the Treaty of Berlin that it
should be effective until ratified by congres-
sional action. It was decided (1) that the
matter of patents is within the treaty-making
power, and that, as between a treaty and an
act of Congress relating to patents, which-
ever is later governs, if there is a conflict;
and (2) that the words of futurity contained
in the Treaty of Berlin indicated that the
rights accorded were to be enjoyed thereafter,
but not that additional acts of the United
States were necessary to put the treaty into
effect. The motion to dismiss having been
overruled, an answer was filed, admitting the
facts, but refuting all the legal implications
relied upon by the plaintiffs. The question
now before the court is precisely the same
as that at the hearing on the motion. In ef-
fect, a reargument has been had; but at the
second hearing new points were advanced by
the Commissioner, which will now be consid-
ered. This practice is not without virtue, in
the eyes of a trial court, somewhat familiar

with the strategy which proposes new points for the first time in the Court of Appeals.

The present contentions of the Commissioner, broadly speaking, are twofold: First, it is claimed that, even if the Treaty of Berlin was self-executing, it is ineffective for the plaintiffs' purpose, because it did not confer rights in præsenti upon the United States, but merely options to exercise rights in futuro. It is conceded that, since the treaty was made, neither the legislative nor the executive branch of the government has signified an election to exercise the rights upon which the plaintiffs rely. The same practical conclusion follows from this argument as from that advanced at the first hearing. If either theory is tenable, some subsequent action on the part of the government was necessary to give effect to the treaty. There is, however, this difference: that if the United States was not given rights, but merely an option to exercise rights, it was not placed under any moral obligation to effectuate the treaty by legislative action, or to accord to the other contracting party the reciprocal rights referred to therein.

In the second place, the Commissioner contends that, even if the treaty was self-executing, and conferred present rights on both the United States and Germany, nevertheless the plaintiff is without remedy in this case, because the time limit provided by article 308 of the Versailles Treaty for the extension of rights of priority had already expired when the Treaty of Berlin was executed, and was not extended thereby. This position was taken by the Commissioner for the first time at the second hearing.

In order that the argument may be more conveniently followed, the following provisions of the Treaty of Berlin and of the Treaty of Versailles are set out. Articles I and II of the Treaty of Berlin (42 Stat. 1942) are as follows:

I. "Germany undertakes to accord to the United States, and the United States shall have and enjoy, all the rights, privileges, indemnities, reparations or advantages specified in the aforesaid Joint Resolution of the Congress of the United States of July 2, 1921, including all the rights and advantages stipulated for the benefit of the United States in the Treaty of Versailles which the United States shall fully enjoy notwithstanding the fact that such treaty has not been ratified by the United States."

II. "With a view to defining more particularly the obligations of Germany under the foregoing article with respect to certain provisions in the treaty of Versailles, it is understood and agreed between the high contracting parties:

"(1) That the rights and advantages stipulated in that treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in section 1 of part IV, and parts V, VI, VIII, IX, X, XI, XII, XIV, and XV.

"The United States, in availing itself of the rights and advantages stipulated in the provisions of that treaty mentioned in this paragraph will do so in a manner consistent with the rights accorded to Germany under such provisions.

"(2) That the United States shall not be bound by the provisions of part I of that treaty, nor by any provisions of that treaty, including those mentioned in paragraph (1) of this article, which relate to the covenant of the League of Nations, nor shall the United States be bound by any action taken by the League of Nations, or by the Council or by the Assembly thereof, unless the United States shall expressly give its assent to such action.

"(3) That the United States assumes no obligations under or with respect to the provisions of part II, part III, sections 2 to 8 inclusive of part IV, and part XIII of that treaty.

"(4) That, while the United States is privileged to participate in the Reparation Commission, according to the terms of part VIII of that treaty, and in any other commission established under the treaty or under any agreement supplemental thereto, the United States is not bound to participate in any such commission unless it shall elect to do so.

"(5) That the periods of time to which reference is made in article 440 of the Treaty of Versailles shall run, with respect to any act or election on the part of the United States, from the date of the coming into force of the present treaty."

Article 308 of part X of the Versailles Treaty is as follows:

"The rights of priority provided by article 4 of the International Convention for the Protection of Industrial Property of Paris, of March 20, 1883, revised at Washington in 1911, or by any other convention or statute, for the filing or registration of applications for patents or models of utility, and for the registration of trade-marks, designs and models which had not expired on August 1, 1914, and those which have arisen during the war, or would have arisen but for the war, shall be extended by each of

of high contracting parties in favour of all nationals of the other high contracting parties for a period of six months after the coming into force of the present treaty. * * * "

Article 440 of part XV of the treaty contains the following provisions : ·

"A first procés verbal of the deposit of ratifications will be drawn up as soon as the treaty has been ratified by Germany on the one hand, and by three of the principal allied and associated powers on the other hand.

"From the date of this first procés verbal, the treaty will come into force between the high contracting parties who have ratified it. For the determination of all periods of time provided for in the present treaty, this date will be the date of the coming into force of the treaty."

[1] In support of his first contention, the Commissioner says that it could not have been intended by the parties to the Treaty of Berlin that article 308 of the Treaty of Versailles should be effective, because the extension of rights of priority thereby provided was unnecessary. The Nolan Act of March 3, 1921 (41 Stat. 1313 [35 USCA §§ 80–87; Comp. St. §§ 9431a–9431h]), had already provided for the emergency. The Treaty of Versailles went into effect January 10, 1920 (Treaties, volume 3, pp. 3329, 3330). Therefore the six months' extension of priority of rights provided by article 308 expired on July 10, 1920. The United States finally declined to become a party to the treaty by the action of the Senate of March 19, 1920, and consequently did not secure the privileges and protection afforded by the treaty, either for itself or its nationals. In order to provide an equivalent, so far as priority rights in patents were concerned, the Nolan Act was introduced in Congress at the request of the Commissioner of Patents on April 20, 1920. It was approved March 3, 1921, and the six months' period therein provided for the extension of priority rights expired September 3, 1921. It became available to citizens of Germany after reciprocal privileges had been extended by the German government to citizens of the United States. The Nolan Act unquestionably was designed to write into the law of the United States the priority provisions of the Treaty of Versailles. This appears, not only from the discussions in Congress (see Congressional Record, February 24, 1921, pp. 3783–3785 and 3948, 3949), but also by a comparison of the act with articles 307 and 308 of the Versailles Treaty.

Therefore, the Commissioner says, there was no occasion to extend further rights of priority, either for the benefit of citizens of the United States or citizens of Germany. To do so would be to make a more liberal provision in regard to German patents than those of any other country. It is pointed out that, by the end of 1921, 371 applications in the Patent Office of the United States were made by Germans under the Nolan Act. See the Annual Report of the Commissioner of Patents, December 31, 1921, 295 O. G. 298. Furthermore, whatever may have been the case between Germany and other countries, which made important the extension of priority rights by the Treaty of Versailles, by reason of the suspension during the war of the International Convention of Paris, the same situation did not exist in the United States. The rights of priority granted by R. S. § 4887 (35 USCA § 32; Comp. St. § 9431), were never repealed, but, on the contrary, were expressly confirmed by the Trading with the Enemy Act of October 6, 1917, c. 106, § .10, 40 Stat. 420 (Comp. St. § 3115½ee). Notwithstanding the war, 1,369 patents were granted to German citizens during the period from 1919 to 1921.

This recital serves to clarify the situation of the parties at the time of the execution of the Treaty of Berlin. It may also serve to some extent to explain the apparent conflict between the treaty-making power, which incorporated article 308 of the Versailles Treaty in the Treaty of Berlin, and the Patent Office of the United States, which insists that Germany and German nationals were treated with sufficient liberality by the Nolan Act, and are entitled to no further extension of priority rights. But the argument is not conclusive. The President, by and with the consent of the Senate, reached the conclusion that in the case of Germany some further extension was necessary. Moreover, article 308 is only one of a large number of provisions of varying character, in which privileges and rights were granted by the Treaty of Versailles to citizens of the United States and of other powers. It seems quite impossible to lift out of the treaty a single section, and to hold it invalid, because unnecessary, and at the same time to give validity to other provisions incorporated in the same document.

Nor is it entirely accurate to say that there was no reason to accord to German patentees an additional period not given to those of other nations. Germany did not pass legislation reciprocal to the Nolan Act until July 14, 1921, after which there remained but

seven weeks during which German patents could be lawfully filed in the United States Patent Office. Indeed, it was not until October 21, 1921, seven weeks after the period had expired, that the Commissioner of Patents formally announced that reciprocal legislation had been passed by Germany, giving effect to the Nolan Act as regards German citizens. See the announcement of the Commissioner of Patents, 291 O. G. 677. It is also noteworthy that article 308 provided not merely for the extension of priority rights for the registration of patents, but also of trade-marks. The Nolan Act has no application whatsoever to trade-marks.

It is therefore important to examine the other reasons of the Commissioner for his contention that, until the United States lays claim to the rights and privileges specified in article II (1) of the Treaty of Berlin, they merely remain as a definition of what the United States may demand, if it so desires. He relies particularly upon the circumstances under which the treaty was executed, the negotiations between the two nations which preceded its execution, the debates in the Senate when its confirmation was under consideration, and the language of the treaty itself. The parties to the treaty, it is said, were dealing with broad generalities, rather than specific details. The United States, as the victor, was compelling the vanquished nation to accord many rights and privileges, stated in vague and general terms, to be thereafter more accurately defined, should the occasion arise.

It is a fact that Germany undertook, by article I of the treaty, to accord to the United States all the rights and privileges specified in the Joint Resolution of Congress of July 2, 1921, as well as all the rights and privileges stipulated for the benefit of the United States in the Treaty of Versailles. The Joint Resolution (42 Stat. 105) declared the state of war between Germany and the United States to be at an end, and expressly reserved to the United States and its nationals all the rights and privileges to which it or they became entitled under the terms of the Armistice of November 11, 1918, or which were acquired by the United States or its nationals by participation in the war, or to which it became entitled as one of the principal allied powers, or by any act of Congress, or otherwise. In addition, the Joint Resolution reserved all the rights and privileges stipulated for the benefit of the United States or its nationals by the Treaty of Versailles. In this way, the Commissioner says, many general

provisions were swept into the treaty by a catch-all so broad as to require further definition—particularly as, in the nature of things, some of the rights and privileges referred to in the Joint Resolution had long since ceased to exist.

Undoubtedly it was the purpose of Congress to claim for the United States and its nationals all possible rights that might have accrued, without taking the risk or trouble to specify exactly what they were. But, when it came to the Treaty of Berlin, the parties were particularly careful to point out precisely what parts of the Treaty of Versailles were included, and what were eliminated. Article II (1) expressly specifies the parts of the Treaty of Versailles which it is intended the United States shall have and enjoy, "with a view to defining more particularly the obligations of Germany," and article II (2) and (3) out of abundant caution specify certain other parts of the treaty as to which the United States assumes no obligation whatsoever. There is no lack of certainty in the method by which part X, including article 308, is referred to in the Treaty of Berlin.

The communications between the Department of State and the American Commissioner at Berlin, immediately preceding the execution of the Treaty of Berlin, are referred to, under the authority of Sullivan v. Kidd, 254 U. S. 433, 442, 41 S. Ct. 158, 65 L. Ed. 344, and Cameron v. Knoxville, 227 U. S. 39, 33 S. Ct. 209, 57 L. Ed. 407. See Senate Document No. 173 of December 13, 1926, entitled "American War Claims against Germany." On July 5, 1921, shortly after the passage of the Peace Resolution, Secretary Hughes inquired whether Germany intended to raise any question as to the rights stipulated for the benefit of the United States in certain parts of the Treaty of Versailles (amongst others, part X), including participation in the Reparation Commission, Commission of Guarantees, and other commissions, so far as the United States might desire. Germany replied that it did not question any of these rights, and agreed that the United States might participate in any of the commissions, but assumed that the United States on its part would recognize the responsibilities which, under the Treaty of Versailles, might be connected with the assertion of the rights and interests desired by the United States.

In the same connection Germany stated that she did not stipulate for a reservation of treaty rights, which might be coming to her, although this seemed to her only reason-

able, as, for instance, the League of Nations, or the provision by which the ultimate ownership of the Saar Valley was to be determined by the League. In other words, Germany, as it would appear, was willing that the United States should have the advantage of such portions of the Treaty of Versailles as it desired, without obligating itself to give to Germany other portions of the treaty to which the United States objected. Secretary Hughes inquired what was meant by Germany's assumption that the United States would recognize certain responsibilities under the treaty. Germany replied that, if the terms of any provision of the treaty under which a right or privilege is claimed by the United States expressly includes a condition or limitation in favor of Germany in respect to such right or privilege, or is inseparably connected with other German treaty rights, it was expected that the United States would not insist on the right or privilege, without also recognizing the condition and limitation. Secretary Hughes replied that the United States had no objection to this position, and that each provision of the treaty must be construed in the light of its context, according to its true meaning. Being pressed strongly for some explicit recognition in the proposed treaty of rights in favor of Germany connected with the rights claimed by the United States, Secretary Hughes proposed the following language, which became the second paragraph of article II (1) of the Treaty of Berlin, to wit: "The United States, in availing itself of the rights and advantages stipulated in the provisions of that [Versailles] treaty mentioned in this paragraph, will do so in a manner consistent with the rights accorded to Germany under such provisions."

At this point in the negotiations, a draft of the proposed treaty had already been submitted. It contained article II (5), referring to the periods of time from which any act or election on the part of the United States should run. Germany objected to this section, claiming that it was obscure, since some acts had already been accomplished under the Versailles Treaty, and as to others fixed periods of time had been provided, which made a delay of an additional 2 years impracticable and unreasonable. For instance, article 428 of the Versailles Treaty provided for the occupation by the allied troops of the west bank of the Rhine for 15 years, upon the coming into force of the treaty. Germany wanted to know whether the United States would be at liberty to claim a longer occupation than other allied powers. Secretary

Hughes replied that Germany attached too much importance to this section, and said positively that it was not intended that it should apply to article 428. The Secretary stated that the United States had in mind such provisions in respect to acts or elections on the part of the United States where time would be important; for instance, article 296 (e), relating to the establishment of clearing offices for the settlement of certain pecuniary obligations, with the proviso that the article should not apply between Germany and any one of the allies, unless notice should be given to Germany within a certain period; also article 304 (a) which provided for the establishment of mixed arbitral tribunals, by each of the allies on one hand and Germany on the other, within three months from the date of the coming into force of the Treaty of Versailles. The Secretary said that, since the periods of time provided for had not been fixed by ratification of the Versailles Treaty by the United States, they should be fixed by agreement in the Treaty of Berlin. This explanation was accepted by Germany, which then announced that it also assumed that the same construction should apply to the period of time provided by article 280 of part X of the Treaty of Versailles. This article established a period of 5 years from the date of the coming into force of the treaty, during which Germany agreed not to impose higher duties upon importation of goods manufactured in any of the allied states than those to which like goods produced in any other state should be subject, and also agreed not to discriminate in other respects against the allies or their nationals. Secretary Hughes also acceded to this interpretation.

These negotiations may be considered in connection with the debates in the Senate on October 17 and 18, 1921, upon the ratification of the treaty. Divers amendments to the treaty were offered during that discussion. It was proposed that, since Germany had undertaken in part V of the Treaty of Versailles to disarm, the United States, in consideration thereof, should agree to join with other parties to that treaty to protect Germany from invasion, or at least to use its good offices to prevent unjustified invasion. With regard to reparations mentioned in article II (4) of the treaty, it was proposed that Germany should be under no obligation to make compensation to the United States for any damage sustained by its nationals, except for damage done to the civil population of the United States, and that the United States should not be entitled to retain any property

coming into its possession since the beginning of the war as the property of German nationals, for the satisfaction of any claims of nationals of the United States, except claims for damages to the civilian population thereof. It was proposed to amend the treaty, so as to declare that the United States assumed no obligation with respect to any part of the Treaty of Versailles. It was later proposed to amend the treaty to the effect that the United States assumed no obligation under the Treaty of Versailles, except such obligations as may be assumed by virtue of article II (1) of the Treaty of Berlin. It was then proposed to amend the treaty by providing that, if the United States should not become a member of the Reparations Commission, the rights reserved under the treaty should be decided between the United States and Germany in such manner as might be thereafter provided. All of these amendments were defeated.

During the discussion, considerable difference of opinion was expressed by various Senators as to whether the parts of the Treaty of Versailles referred to in article II (1) of the Treaty of Berlin became, by such reference, a part of the last-mentioned treaty, and whether the United States obtained any present rights and assumed any present obligations under the treaty, or was given merely an option to exercise rights in the future, postponing the reciprocal obligations to Germany until such time, if ever, as the United States should choose to exercise the rights accorded to it. Certain Senators were undoubtedly of the opinion that the United States received, not rights, but merely options to exercise rights, while other Senators took the opposite view, and asserted that the United States not only obtained present rights, but incurred present obligations to Germany, supporting their contention by the language of the treaty itself. It is impossible to ascertain from the debates whether the majority of the Senate had a settled conviction on these points. It was alleged that a majority of the Senate favored the optional view, and this may have been the case, although it is perhaps justifiable to draw a contrary inference from the fact that the amendment was lost which expressly declared that the United States assumed no obligations under the treaty. In no event can it be asserted that the action of the Senate supports the contention of the Commissioner of Patents, although his views undoubtedly find some support in the utterances of certain Senators during the debate.

It should be borne in mind that the matters chiefly considered, both in the preliminary negotiations and in the Senate debates, were the national rights and obligations of the government, rather than those of its citizens. There was much discussion of the propriety of the acceptance by the United States of membership upon the Reparations Commission, which is expressly made optional by article II (4) of the treaty. Likewise part V of the Versailles Treaty, relative to the disarmament of Germany was considered, including the stipulation that this process should be executed under the control of interallied commissions especially appointed for the purpose by the principal allied and associated powers, as set out in article 203. Manifestly the appointment of a member upon either commission was an act to be performed by the United States in the future, if it should see fit. The prominence which these provisions took in the debate, and the fact that each of them required some further action on the part of the United States to make participation effective, may perhaps account for the views expressed by some of the members of the Senate that the rights conferred by the treaty were optional.

There was some discussion of part VIII of the Versailles Treaty relating to reparations, and the acknowledgment by Germany of its responsibility for the loss and damage to which the allied governments and their nationals had been subjected as a consequence of the war. It was pointed out that, under this part of the treaty, Germany conceded the right of the United States to retain the property of German citizens seized by the United States and then in the possession of the Alien Property Custodian as security for the claims of the United States and its nationals. Reference was also made to certain of the clauses of part X, whereby Germany promised, as already pointed out, not to discriminate in certain particulars during certain periods against the allies or their nationals. No reference was made to article 308 of part X; and there was nothing in the debate to suggest that the rights of nationals referred to therein or elsewhere in the treaty were not granted by Germany and acquired by them without the necessity of further action on the part of the United States.

[2] Referring to the phraseology of the Treaty of Berlin itself, the Commissioner points out that the mutual promises of the contracting parties, usually found in a treaty by which each nation grants to the other certain privileges or rights, are lacking in this case. The treaty takes the form

of a grant by Germany without consideration. By article I Germany undertakes to accord to the United States, for its enjoyment, certain rights and privileges; but there is no grant or promise on the part of the United States. The obligations of Germany are more specifically defined in article II by reference to certain parts of the Versailles Treaty, and it is stated that the United States, in availing itself thereof, will do so in a manner consistent with the rights accorded therein to Germany. Here it is true there is a suggestion that rights are accorded, not only to the United States, but also to Germany. But this very phrase is said to signify that the mutual promises shall become effective only upon election by the United States. The German Patent Office seems to have given the language this construction, relying upon a translation into German, which translated back into English is said to mean in substance that, *if* the United States shall avail itself of the rights stipulated in the Versailles Treaty, it' will do so in a manner consistent with the rights of Germany. See 21 F.(2d) 221. It has been held that the foreign text of a treaty, to which the United States is a party, may be consulted to ascertain its meaning. U. S. v. Percheman, 7 Pet. 51, 83, 8 L. Ed. 604.

The United States, of course, was in the position of conqueror, and most of the rights and advantages in question were granted by the vanquished nation. Nevertheless an examination of the language of the treaty does not justify the conclusion that no present rights were granted thereby to the United States or its nationals. The events which gave rise to the insertion of the second paragraph of article II (1) of the Treaty of Berlin have already been set out. It was put in, not to indicate that it was optional with the United States to exercise the specified rights, but rather to reassure Germany that these rights would not be enjoyed by the United States without recognizing the cognate provisions of the Treaty of Versailles, which contained qualifications or conditions in favor of Germany. It is noteworthy that the treaty of peace between the United States and Austria, which was signed at Vienna August 24, 1921, and ratified by the Senate on the same day as the Treaty of Berlin (see Treaty Series No. 659, published by the Government Printing Office), contains a precisely similar clause to that under discussion. It is published in English only, without German translation, but there is no reason to believe that it has a different meaning in the Treaty of Vienna than it has in the Treaty of Berlin. In contrast with the action of the German Patent Office, the Austrian Patent Office, it is conceded, by reason of the peace treaty, extended the time for filing patent applications until May 8, 1922; that is to say, for six months after the date from which the ratifications of the United States and Austria were exchanged at Vienna.

Undoubtedly some of the rights granted to the United States under the terms of the Treaty of Versailles were in the nature of options, a fact which has perhaps given rise to the belief in some quarters that all the rights were optional in character. For instance, article 296 (e), in regard to the establishment of clearing offices, is to the effect that article 296 shall not apply to any of the allies, unless, within a period of one month after the ratification of the treaty by the power in question, notice is given to Germany. Article 291 expressly reserves to the allied powers the right to accept or not the enjoyment of the rights and advantages granted by Germany to her allies. Article 289 gives to each of the allied powers the privilege of notifying Germany within a period of six months of the treaties or conventions which it may wish to revive with Germany. On the other hand, there are many provisions of the treaty, particularly part X in regard to industrial property, which in terms create immediate rights; for instance, article 264, as to duties and imports; article 267, as to favors, immunities, or privileges in regard to the importation, exportation, or transit of goods; article 276, as to the exercise by the nationals of the allies of certain occupations and professions in Germany; article 277, as to the protection of nationals in German territory, and their right of access to the courts, etc.

Moreover, the Treaty of Berlin contains strong evidence, by the inclusion of certain exceptions, that the United States receives, without further action on its part, specified privileges and advantages. Article II (1) gives to the United States the benefit of part VIII of the Treaty of Versailles, entitled "Reparations," but article II (4) states that, while the United States is privileged to participate in the Reparations Commission, it is not bound to do so unless it shall so elect. Furthermore, it is provided in article II (2) that the United States shall not be bound by any of the provisions of the Versailles Treaty mentioned in article II (1), which relate to the covenant of the League of Nations, unless the United States shall expressly give its assent to such action. These provi-

sions would have been totally unnecessary, if all the rights accorded in article II (1) were optional. Again it is provided in article II (2) and (3) that the United States assumes no obligations with respect to the provisions of part I, part II, part III, sections 2 to 8 of part IV and part XIII of the Versailles Treaty. The plain implication is that the United States did acknowledge the obligations to Germany specified in other parts of the Versailles Treaty under which the United States acquired rights.

[3] These considerations have been examined at length, because of the great emphasis placed upon them by counsel for the Commissioner of Patents. The conclusion is that there is no solid foundation for the contention that the rights granted to the United States were merely optional, requiring further action to give them effect. Certain decisions tend to confirm this result. It was held by the Circuit Court of Appeals of the Second Circuit, in Munich Reinsurance Co. v. First Reinsurance Co., 6 F.(2d) 742, at page 748, that where stock in a domestic reinsurance corporation, owned by a German reinsurance corporation, was seized by the Alien Property Custodian under the Trading with the Enemy Act, the alien corporation was not entitled to sue for an accounting against the domestic corporation to which the Custodian had paid, out of the proceeds realized from the sale of the stock, a claim against the German corporation, since the act gave no right of action, and the Treaty of Berlin relegated German nationals to claim against their own government for compensation for confiscated property. See, also, Klein v. Palmer (C. C. A.) 18 F.(2d) 932. The Supreme Court has also held, in United States v. Chemical Foundation, 272 U. S. 1, 11, 47 S. Ct. 1, 71 L. Ed. 131, that the Treaty of Berlin prevents the enforcement of any claim by Germany or its nationals against the United States or its nationals, on account of the seizures and sale of German properties under the Trading with the Enemy Act. There is no suggestion in these decisions that the rights and advantages relied upon have been acquired by an act or election of the United States subsequent to the treaty. On the contrary, the decisions are based on the language of the treaty itself.

[4] The final contention of the Commissioner is that there is no provision in the Treaty of Berlin for the extension of the time limit provided by article 308 of the Versailles Treaty, which expired July 10, 1920. The Commissioner points out that there is no declaration in the Treaty of Berlin by which this particular period of time was specifically extended, and contends that there is no general term in the treaty applicable to article 308 and all other provisions of the Treaty of Versailles by which extensions of time are brought about. The only general clause of this character is article II (5). It provides substantially that the periods of time referred to in article 440 of the Treaty of Versailles shall run with respect to any act or election on the part of the United States from the date of the coming into force of the Berlin Treaty. But this extension, it is urged, relates only to acts or elections on the part of the United States; whereas article 308 applies to the acts of individual patentees. Attention is again directed to the objection raised during the negotiations of the treaty by Germany that article II (5) is obscure. Secretary Hughes replied, as already shown, that in drafting this section the United States had in mind those provisions of the Versailles Treaty in respect to acts or elections on the part of the United States, where time would be important, as for instance, article 296 (e) and article 304 (a) above described. Since the illustrations of the Secretary were confined to acts by the United States as a nation, it is contended that article II (5) refers only to such acts, and does not include acts or elections on the part of nationals of either party to the treaty.

The argument finds some support in the terms of the section, if taken literally, but takes no account of the fact that it renders article 308 entirely nugatory. The time limit prescribed thereby having expired, it was useless to insert the article, except with the understanding that it be given new life. There were other articles in the Versailles Treaty specified in the Treaty of Berlin in like case. It would therefore be fair to assume, even if the Treaty of Berlin were silent on the subject, that the periods of time provided in these articles should run from the date when the later contract came into effect. Such a construction is far more reasonable than one which would require the nullification of provisions of the earlier treaty specified in the later, in order to accord substantial privileges upon nationals of the United States.

Furthermore, when article II (5) is read in connection with other parts of the Treaty of Berlin, it becomes clear that it refers, not only to acts or elections on the part of the United States, but also to acts or elections of nationals. It is noticeable that nowhere in articles I, II, or III, which constitute the

body of the Treaty of Berlin, is there any mention in terms of the rights of nationals. Article I states that Germany undertakes to accord certain rights ·to the United States. Article II defines those rights more particularly. Article III refers only to the forms of ratification. Nevertheless it was obviously not the intention of the United States to ignore the rights of nationals, or to forego those parts of the Treaty of Versailles which defined them. Any doubt on this point is removed ·by the provisions of the Joint Resolution executed before the treaty, and recited therein, and also by the understanding of the Senate, expressed in its resolution of ratification. Section 2 of the Joint Resolution (42 Stat. 105) declares that there are expressly reserved, to the United States and its nationals, certain rights and privileges, including those stipulated in the Treaty of Versailles for its or their benefit. The understanding of the Senate declares "that the rights and advantages which the United States is entitled to have and enjoy under this treaty embrace the rights and advantages of nationals of the United States specified in the Joint Resolution or in the provisions of the Treaty of Versailles, to which this treaty refers."

It seems to follow inevitably that, if the rights conferred upon the United States by article II (1) of the Treaty of Berlin include also the. rights of nationals, then the extension of the periods of time provided by article II (5) should be so interpreted as to refer not only to acts of the United States, but also to acts of nationals. Article II (5) should be taken in substance to mean that the periods of time shall run with respect to any act or election on the part of the United States, *or its nationals,* from the date of the coming into force of the present treaty. Thereby the extension of the period specified in article 308 would inure, not only to nationals of this country, but also to nationals of Germany, since the United States agreed in the second paragraph of article II (1) that, in availing itself of rights and 'advantages stipulated for its benefit in the Versailles Treaty, it would do so in a manner consistent with the rights accorded in Germany.

It is true that Secretary Hughes, in explaining article II (5), made no reference to the rights of nationals; but this omission is not controlling, since it is apparent, from an examination of the negotiations, that the representatives of the two governments were chiefly concerned with the more important provisions involving national action. Final-

ly, the plaintiffs very properly point out that the language quoted from the Senate Resolution is not, strictly speaking, a reservation on the part of the Senate, but an interpretation of the meaning of the treaty, and that, subsequent to the Senate's action, the President ratified the treaty, subject to the understanding recited, and thereafter the treaty was ratified by Germany.

The plaintiffs are entitled, in the opinion of the court, to register their patent, as prayed in the bill of complaint, and a decree to this effect will be accordingly signed.