**ROBERTSON, Commissioner of Patents, v. GENERAL ELECTRIC CO. et al.**

Circuit Court of Appeals, Fourth Circuit. April 9, 1929.

No. 2771.

Harry E. Knight, Sp. Asst. to Atty. Gen., and T. A. Hostetler, Sol. U. S. Patent Office, of Washington, D. C., for appellant.

Harrison F. Lyman, of Boston, Mass. (Fish, Richardson & Neave, of Boston, Mass., Charles E. Tullar, of Schenectady, N. Y., and Semmes, Bowen & Semmes, of Baltimore, Md., on the brief), for appellees.

Before WADDILL and PARKER, Circuit Judges, and McDOWELL, District Judge.

PARKER, Circuit Judge. This is an appeal from a decree directing the Commissioner of Patents to issue letters patent to the General Electric Company and one Ernst Stoffregen, covering an invention previously patented in Germany. Application for patent was filed with the Patent Office on May 10, 1922. It was rejected by the Patent Office Examiner on the ground that it had been filed more than twelve months after the filing of the foreign application. Later it was finally rejected by the Examiner in an opinion concurred in by the Law Examiner. On appeal this decision was affirmed by the Board of Examiners in Chief, in which full consideration was given to the Treaty of Berlin and the provisions of the Treaty of Versailles which it adopted. On appeal to the

Commissioner of Patents, the decision was affirmed by him. Appeal was taken to the Court of Appeals of the District of Columbia, and the decision of the Patent Office was affirmed by that court. In re Stoffregen, 56 App. D. C. 23, 6 F. (2d) 943. Application was made to the Supreme Court for certiorari, and same was denied. 269 U. S. 569, 46 S. Ct. 26, 70 L. Ed. 417. Appellees then filed a bill in the court below under R. S. 4915, 35 U. S. C. 63 (35 USCA § 63) against the Commissioner of Patents, praying that they be adjudged legally entitled to the patent and that the Commissioner be authorized and directed to issue same. The District Judge overruled a motion to dismiss the bill [21 F. (2d) 214], and upon final hearing found in favor of complainants. [25 F. (2d) 146.] From this finding, and the decree thereon, the Commissioner of Patents has appealed.

The German application of complainants was filed October 11, 1915, and the German patent was issued thereon October 20, 1919. As stated above, the application was not filed in the United States until May 10, 1922, after the lapse of much more than the year limited by section 4887 of the Revised Statutes, 35 U. S. C. 32 (35 USCA § 32), and more than six months after the expiration of the time limited by the Nolan Act of March 3, 1921, 41 Stat. 1313 (35 USCA §§ 80–87). It is conceded, therefore, that this application is barred under section 4887 of the Revised Statutes and under the Nolan Act; but the contention in behalf of applicants is that the application was filed within six months of the date of the coming into effect of the Treaty of Berlin (42 Stat. 1939), and that the effect of that treaty was to extend the time for filing such application for a period of six months after the date upon which it became effective. This contention is based upon the provision of the Treaty of Berlin adopting by reference certain articles of the Treaty of Versailles, in one of which is included section 308, relating to priority rights of foreign inventors. A proper consideration of the point involved requires, therefore, that we consider the bearing upon each other of section 4887 of the Revised Statutes, section 308 of the Treaty of Versailles, the Nolan Act, the purpose of which was to incorporate into the law of this country the provisions of section 308, and finally the Treaty of Berlin, which referred to and adopted certain provisions of the Treaty of Versailles.

Section 4887 of the Revised Statutes in its present form is the codification of provisions of the Acts of July 8, 1870 (16 Stat. 201), March 3, 1897 (29 Stat. 693), and March 3, 1903 (32 Stat. 1225), the last of which was enacted to incorporate into our law the provisions of the International Convention for the Protection of Industrial Property of Paris, of March 20, 1883, as modified by the Convention of Brussels of December 14, 1900. It provides that no person, otherwise entitled to a patent for his invention or discovery, shall be debarred from receiving a patent by reason of its having been first patented by the inventor in a foreign country, unless the foreign application shall have been filed more than twelve months prior to the application in this country, in which case no patent shall issue in this country. In other words, its effect is that the owner of a foreign patent may obtain a patent for his invention in this country, if it is otherwise patentable under our laws, provided he makes application therefor within twelve months after the filing of the foreign application.

Provisions similar to those of this section are found in the laws of most civilized nations; but during the World War it was impossible for inventors of the warring nations to avail themselves of the provisions of such statutes of enemy countries. This, accordingly, was one of the many matters dealt with by the Treaty of Peace of Versailles, article 308 of which provided:

"The rights of priority, provided by article 4 of the International Convention for the Protection of Industrial Property of Paris, of March 20, 1883, revised at Washington in 1911, or by any other convention or statute, for the filing or registration of applications for patents or models of utility, and for the registration of trade marks, designs and models which had not expired on August 1, 1914, and those which have arisen during the war, or would have arisen but for the war, shall be extended by each of the high contracting parties in favour of all nationals of the other high contracting parties for a period of six months after the coming into force of the present treaty."

The Senate of the United States, on March 19, 1920, definitely refused to ratify the Treaty of Versailles. Nevertheless, a month and a day later, April 20, 1920, what is known as the Nolan Act was introduced into the House, its purpose being to secure protection to American and foreign inventors in accordance with section 308 of the Versailles Treaty. See Congressional Record

of 67th Congress, Third Session, pp. 3783–3785 and 3947–3949. It was approved March 3, 1921 (41 Stat. 1313), and extended the time for filing application for six months, or until September 3, 1921, to foreign inventors whose countries should grant reciprocal privileges to the inventors of this country. It followed almost exactly the language of section 308 of the Versailles Treaty, except that, instead of providing that the rights under existing laws should be extended, the language used was "shall be, and the same are hereby, extended," etc. The exact language of that part of the act which is pertinent is as follows:

"That the rights of priority provided by section 4887 of the Revised Statutes, for the filing of applications for patent for inventions and designs, which rights had not expired on the 1st day of August, 1914, or which rights have arisen since the 1st day of August, 1914, shall be, and the same are hereby, extended until the expiration of a period of six months from the passage of this act in favor of the citizens of the United States . or citizens or subjects of all countries which have extended, or which now extend, or which within said period of six months shall extend substantially reciprocal privileges to citizens of the United States, and such extension shall apply to applications upon which patents have been granted, as well as to applications now pending or filed within the period herein."

On July 2, 1921, Congress passed the joint resolution ending the war with Germany (42 Stat. 105), which provided, among other things, that there was reserved to the United States and its nationals "any and all rights, privileges, indemnities, reparations, or advantages, together with the right to enforce the same, * * * which, under the Treaty of Versailles have been stipulated for its or their benfit." On July 1, 1921, friendly relations with Germany were restored, and on July 6th there was promulgated a decree, published in the Reichsgesetzblatt for July 14th, which granted to American citizens privileges reciprocal to those granted to citizens of Germany in the Nolan Act. This decree was promulgated under the law for the carrying out of the Treaty of Versailles, and accorded to citizens of the United States the rights of priority provided in article 4 of the International Convention for the Protection of Industrial Property Rights, as revised in 1911, up until September 3, 1921, the date to which similar extension had been granted by the Nolan

Act. Citizens of Germany thereupon proceeded to avail themselves of the provisions of the Nolan Act, and 371 applications for patents were filed by them thereunder, which was the largest number from any country; there being only 355 from the British Isles and 244 from France.

On November 2, 1921, the treaty of peace between the United States and Germany, known as the Treaty of Berlin, was ratified; and on November 11, 1921, it took effect upon the exchange of ratifications. This treaty is a very brief document. See 42 Stat. 1942. Article 1 thereof provides, among other things, that the United States shall have and enjoy "all the rights, privileges, indemnities, reparations or advantages" specified in the joint resolution of Congress which ended the war, including all the "rights and advantages" stipulated for the benefit of the United States in the Treaty of Versailles. Article 2 is the one upon which complainants chiefly rely, and the pertinent provisions thereof are as follows:

"With a view to defining more particularly the obligations of Germany under the foregoing article with respect to certain provisions in the Treaty of Versailles, it is understood and agreed between the high contracting parties:

"(1) That the rights and advantages stipulated in that treaty for the benefit of the United States, which it is intended the United States shall have and enjoy, are those defined in section 1, of part IV, and parts V, VI, VIII, IX, X, XI, XII, XIV, and XV.

"The United States in availing itself of the rights and advantages stipulated in the provisions of that treaty mentioned in this paragraph will do so in a manner consistent with the rights accorded to Germany under such provisions.

* * * * * * *

"(5) That the periods of time to which reference is made in article 440 of the Treaty of Versailles shall run, with respect to any act or election on the part of the United States, from the date of the coming into force of the present treaty."

The contention of complainants is that the Treaty of Berlin had the effect, without supporting legislation, of extending, for an additional period of six months from the date when it became effective, the priority rights of German citizens under the Convention of 1883 as amended and section 4887 of the Revised Statutes, which incorporated the provisions of the convention into our statute law, or, in other words, that it had the

effect of extending for another six months the period during which such citizens might file applications for patents or inventions upon which foreign patents had already been obtained. If this contention can be maintained, they are entitled to a patent on the application filed, as it was filed May 10, 1922, and the six months period following the coming into effect of the treaty did not expire until the following day. We do not think, however, that the contention can be maintained, and this for two reasons: (1) Because we do not think that the Treaty of Berlin should be construed as providing that the priority rights of German and American inventors should be again extended for a six months period, in view of the fact that their rights had already been protected in accordance with the provisions of section 308 of the Versailles Treaty by the Nolan Act and the reciprocal decree of Germany; and (2) because, even if the Treaty of Berlin be so construed, such construction must rest upon the adoption by that treaty of section 308 of the treaty of Versailles, which is not self-effectuating, and no supporting legislation has been enacted in aid thereof.

█ On the first proposition, it must be remembered that the Treaty of Berlin makes no reference whatever to priority rights of foreign inventors or to section 308 of the Treaty of Versailles. That section becomes of importance merely because it is included with many other sections in part X of the Treaty of Versailles, which is referred to in the Treaty of Berlin as one of those parts stipulating rights for the benefit of the United States which it is intended that she shall have and enjoy. At the time of the ratification of the Treaty of Berlin, the Treaty of Versailles had been in effect for nearly two years, many of the things provided for therein had already been accomplished, and the greater number of the sections embraced within the parts referred to in the Treaty of Berlin had at that time no practical significance whatever. While we do not subscribe to the theory, as the Reichsgericht, the highest court of Germany, seems to do, that the treaty created a mere option on the part of the United States to avail itself of such of the provisions of the Versailles Treaty as it might choose (see Entscheidungen of the Reichsgericht, vol. 114, p. 252, and compare U. S. v. Chemical Foundation, 272 U. S. 1, 11, 47 S. Ct. 1 [71 L. Ed. 131]), it is clear that it was not intended that either country or its citizens should assume any obligation or acquire any additional rights

under those provisions of the Treaty of Versailles which had already been carried out or for any other reason had become obsolete. For instance, it was provided by section 269 of the Treaty of Versailles that during the first six months after its coming into effect the duties imposed by Germany on imports from Allied and Associated States should not be higher than the most favorable duties which were applied to imports into Germany on July 31, 1914; but certainly no one would contend that, by the Treaty of Berlin, Germany again restricted her power to tax imports for an additional period of six months. Many other sections are in like case, and were manifestly not intended to be brought forward as live provisions of the Treaty of Berlin.

██ We think that section 308 of the Treaty of Versailles is one of those which had accomplished its purpose and become obsolete at the time of the negotiation of the Treaty of Berlin, and that, therefore, it is not to be construed as imposing additional obligations or conferring additional rights upon either the United States or Germany because of that treaty. In the first place, the time limited under section 308 had expired more than a year before the Treaty of Berlin was negotiated. It is argued that this time was extended by section 5 of article II of the Treaty of Berlin, which we have quoted above; but this section extends only the time "with respect to any act or election on the part of the United States," and clearly refers to certain acts or elections to be made by the United States as a condition to the enjoyment of certain rights which it was to enjoy only in case it should elect to do so within a specified time. For instance, section 289 of the Versailles Treaty stipulated that any of the Allied Powers might revive any bilateral treaty with Germany which it might wish to revive by giving Germany notice of its election to do so within a period of six months. Section 296, providing for the establishment of clearing offices for the settlement of debts between citizens of Germany and the Allied Nations, stipulated that the section should not apply as between Germany and any particular nation, unless within one month of its ratification of the treaty, such nation should give notice to Germany that it desired to enter into such arrangement. There were a number of other sections of the Versailles Treaty stipulating rights for the several Allied and Associated Nations, but requiring action on the part of any one of them desiring to avail itself of

the rights specified under these sections; and it was manifestly to these that the provisions of section 5 of article II of the Treaty of Berlin were intended to refer.

While the Treaty of Berlin was being negotiated, the German authorities raised the point that, under section 5 of article II, a contention might be made that the period of occupation of the territory west of the Rhine and of the bridgeheads might be extended for an additional period, since section 428 of the Versailles Treaty provided for Allied occupation for fifteen years from the coming into force of the treaty, and it might be contended that as to the United States this period should run from the coming into force of the treaty then being negotiated. Secretary Hughes replied to this and stated that section 5 of article II would not extend the time limited by such sections, but would apply only to such matters as we have indicated above. See telegram of August 8, 1921, set forth in Senate Document No. 173, 69th Congress, 2d Session, p. 11. He said in this connection:

"Rosen evidently attaches too much importance to subparagraph (5) of article II. You may say positively that it was not intended that this paragraph should apply to the period fixed by article 428, and if a collateral formal declaration is desired to that effect, you can make it. It is not deemed advisable to redraft the paragraph, as more specific statement is impracticable. Department had in mind provisions with respect to acts or election on the part of the United States where time would be important under provisions such as are contained in subparagraph (e), article 296, relating to clearing house plan, and paragraph (a), article 304, relating to Mixed Arbitral Tribunal. As periods of time provided for by these provisions have not been fixed by ratification on the part of the United States, they should be fixed now by agreement."

And not only does it appear that the time limited by section 308 had expired before the negotiation of the Treaty of Berlin, but also that the purpose of that section, in so far as it affected the United States and Germany, had already been accomplished by the enactment of the Nolan Act and the promulgation of the reciprocal decree of Germany. As stated above, the Nolan Act was passed expressly to carry out the purpose of section 308 of the Versailles Treaty. It employs almost the exact language of that section and prescribes the same time limit. The reciprocal decree of Germany was based on legislation passed in execution of the Versailles

treaty, and prescribes the same time limit as the Nolan Act. Both nations, therefore, had, as between themselves, carried out the provisions of the section; and it is not reasonable to assume, merely because it happened to be included in a part of the Versailles Treaty specified in the Treaty of Berlin as setting forth rights to which the United States was entitled, that the parties intended to give each other further and additional rights thereunder. If the section be considered as a part of the treaty between the two countries, it must be considered as a part which had already been carried out and performed and under which no future rights or obligations were contemplated.

The Reichsgericht has had under consideration the question as to whether the Treaty of Berlin gave any additional rights over those given by the Nolan Act and the reciprocal German decree, and has expressly held that it did not. See 114 Entscheidungen of the Reichsgericht, supra, p. 252. In the course of that opinion, this highest court of Germany said:

"This legal condition has not been altered by the treaty of peace concluded between Germany and the United States on August 25, 1921, and ratified by the German Diet on October 20, 1921. This treaty stipulates in article 1 the obligation of Germany to allow the United States all rights established in her favor in the treaty of Versailles, and in article 2, #1, expressly mentions as such the rights contained in part X of that treaty, which includes those referring to industrial property (articles 306 to 311). As this Senate pointed out in its decision of June 2, 1923, it is to be inferred from article 2, #1, par. 2, these rights are not ipso facto to belong to the citizens of the United States, but a special decision and declaration on the part of the United States was needed. This, however, was lacking. * * * Moreover, according to the German view agreeing with that of the United States the regulations of the Nolan Act and the proclamation of July 6, 1921, were not in any way to be altered by the treaty of peace. This results from the very fact that the United States even now sustains the Nolan Act and has not made further changes in consequence of article 307, par. 2, of the Versailles Treaty."

The expressions used by the German court bring us to the second ground upon which we think that the prayer of complainants must be denied, viz.: That even if the Treaty of Berlin be construed as incorporating section 308 of the Versailles Treaty as a live provision under which future action was to

be taken, nevertheless complainants are not entitled to the patent applied for, because the section is not self-executing and no legislation has been enacted to carry it into effect. Assuming that a treaty provision affecting patents may be made self-executing, so that no supporting legislation is necessary under the Constitution to give rise to individual rights thereunder, we are satisfied that section 308 was not intended to be, and is not, such a self-executing provision.

■ The rule as to whether a treaty is self-executing or not is clearly stated by Chief Justice Marshall in Foster & Elam v. Neilson, 2 Pet. 253, 313, 7 L. Ed. 415, as follows:

"A treaty is, in its nature, a contract between two nations, not a legislative act. *It does not generally effect, of itself, the object to be accomplished, especially so far as its operation is infraterritorial,* but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States, a different principle is established. Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the Legislature, whenever it operates of itself, without the aid of any legislative provision. *But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the Legislature must execute the contract, before it can become a rule for the court.*" (Italics ours.)

The language of section 308 is that "the rights of priority * * * shall be extended *by each of the high contracting parties,*" etc. This not only uses language of futurity, "shall be extended," as to a matter operating as to each nation *infraterritorially,* and not between nations, but it also provides that the extension shall be made, not by the instrument itself, but "by each of the high contracting parties." In other words, to use the language of Chief Justice Marshall, each of the parties "engages to perform a particular act," and therefore "the treaty addresses itself to the political, not the judicial, department, and the Legislature must execute the contract before it can become a rule for the court."

■ It was the opinion of Attorney General Miller (19 Op. Attys. Gen. 273) that, as Congress alone was given by the Constitution the power "to promote the progress of science and useful arts by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries," treaty provisions relating to patent rights must be deemed dependent upon legislation in aid thereof. And this seems to have been the view also of Judge Lowell in United Shoe Machinery Co. v. Duplessis Shoe Machinery Co. (C. C.) 148 F. 31, and there is much to be said in its favor. Patent rights differ from many other rights which are the subject of treaties, in that they are created by and dependent upon statutes which only Congress has power to enact. Furthermore, the right under a patent is not one which extends across national boundaries, and is therefore necessarily a matter for regulation by treaty, but is one which must be enjoyed within the territory of the nation. We think, however, that the better view is that a treaty affecting patent rights may be so drawn as to be self-executing. See United Shoe Machinery Co. v. Duplessis Shoe Mach. Co. (C. C. A. 1st) 155 F. 842; Hennebique Construction Co. v. Myers (C. C. A. 3rd) 172 F. 869; Cherokee Tobacco, 11 Wall. 616, 621 (20 L. Ed. 227); Hijo v. U. S., 194 U. S. 315, 324, 24 S. Ct. 727 (48 L. Ed. 994). But the reasons which led to the doubt as to whether a treaty could be so drawn as to effect patent rights, without supporting legislation by Congress, are matters which must be considered in the interpretation of treaties affecting patents; and they require that such treaties be held not self-executing, unless their language compels a different interpretation.

Patent rights are valid, of course, only within the country granting the patent. They are created by statute, and complicated administrative machinery is provided for the application of the statutory provisions. Treaties are drafted ordinarily to accomplish certain general results, and in the nature of things cannot regulate details and ought not to interfere with the domestic machinery which the several countries have provided for the regulation of patents. For these reasons, unless a contrary intention is clearly indicated, they should be construed, not as of themselves making changes in the patent laws, but as contemplating that the various parties signatory will enact appropriate legislation and promulgate proper rules to effectuate the ends which they are designed to accomplish.

This rule of construction has been uniformly followed in this country, and treaties affecting patent rights have been held to be not self-effectuating, where the purpose that they should be carried out by supporting legislation was not by any means so clearly in-

dicated as in the section of the treaty under consideration. Thus article II of the Convention of March 20, 1883, provided:

"The subjects or citizens of each of the contracting States shall enjoy, in all the other states of the Union, so far as concerns patents for inventions, trade or commercial marks, and the commercial name, the advantages that the respective laws thereof at present accord, or shall afterwards accord to subjects or citizens. In consequence they shall have the same protection as these latter, and the same legal recourse against all infringements of their rights, under reserve of complying with the formalities and conditions imposed upon subjects or citizens by the domestic legislation of each state."

In the opinion of Attorney General Miller, referred to above, this article was held not to be self-executing, but to require the support of legislation before it became a rule for the courts to follow. While the constitutional question to which we have adverted was discussed, the opinion was finally based upon the proposition that the treaty was a contract operating in the future *infraterritorially*. The Attorney General said:

"It is not necessary to the decision of the question submitted to me in the matter under consideration to determine whether all the provisions of treaties, whose execution requires the exercise of powers submitted to Congress, must be so submitted before they become law to the courts and executive departments, for the treaty under consideration is a reciprocal one; each party to it covenants to grant in the future to the subjects and citizens of the other parties certain special rights in consideration of the granting of like special rights to its subjects or citizens. *It is a contract operative in the future infraterritorially. It is therefore not self-executing, but requires legislation to render it effective for the modification of existing laws.*" (Italics ours.)

In Rousseau v. Brown, 21 App. D. C. 73, Rousseau, a citizen of France, based his claim upon the provisions of the Convention of March 20, 1883. In denying his claim, the court said:

"The convention is in the nature of a contract between the parties thereto, and is not self-executing. It requires the action of Congress to give it full force and effect. *This is the construction that has been placed upon it by most of the parties to it, and they have adopted legislation giving effect to it.* * * * But without regard to the action of other states, *the uniform construction of that convention by the Patent Office officials, and by the courts of this country, has been that the convention is not self-executing,* but requires the aid of an act of Congress." (Italics ours.)

See, also, opinion of Judge Coxe in Accumulator Co. v. Julien Electric Co. (C. C.) 57 F. 605, 615.

The Convention of Brussels of December 14, 1900, changed the priority period for patents to twelve months and inserted in the prior convention a section known as article "4 bis," as follows:

"Patents applied for in the different contracting States by persons admitted to the benefit of the convention under the terms of articles 2 and 3 shall be independent of the patents obtained for the same invention in the other states adherents or nonadherents to the Union."

There was some controversy in the lower courts as to whether this was a self-executing provision or not, but the Supreme Court, in Cameron Septic Tank Co. v. Knoxville, 227 U. S. 39, 49, 33 S. Ct. 209 (57 L. Ed. 407) set these controversies at rest by showing that it was the sense of Congress that the treaty required legislation to become effective, that this was the understanding of other nations also, and that the act of 1903 was passed to carry it into effect. The court said:

"The act of 1903 was then enacted, and if there could be any doubt that it expressed the sense of Congress and those concerned with the treaty that it required legislation to become effective, such doubt would be entirely removed by the legislative action of other states. It appears from the report of the committee on patents of the Senate and of the House of Representatives on the proposed legislation that 13 countries had adopted legislation giving full force and effect to the provisions of the additional act either in the form of a general law or by specific amendment to other laws providing for carrying into force the provisions of the additional act as regards the extension of the 'delay and priority' to twelve months. Other countries were mentioned as being expected to do so. In explaining the object of the bill the member in charge of it in the House of Representatives said that it was to carry into effect the additional act of the convention held at Brussels in December, 1900. * * * If it [the treaty] be not self-executing, as it is certainly the sense of Congress that it was not and seems also to be the sense of some of the other contracting nations, and as the act of 1903 did not make effective article 4 bis, the provisions of section 4887 apply to the Cameron patent and caused it to

502

expire with the British patent for the same invention."

In the light of these decisions, relating to treaties the language of which does not negative the idea of self-execution near so plainly as does that of section 308 of the Treaty of Versailles, it is clear that that section cannot reasonably be construed as self-executing. As no legislation has been passed in aid of it, except the Nolan Act, the time limit of which had expired before complainants filed their application, it follows that there is nothing upon which they can base the extension of priority rights for which they contend.

We have given careful consideration to the able opinion of the learned District Judge, but, after full consideration, we are of opinion that the decision of the Court of Appeals of the District of Columbia, which the Supreme Court declined to review, was correct. In this we are supported by the recent decision of the Reichsgericht, to which we have referred, construing the same treaty and arriving at the same conclusion, a decision which, although not binding, is highly persuasive. There was error, therefore, in the decree of the District Court, and same is accordingly reversed, and the cause is remanded, with directions to dismiss the bill.

Reversed.